UNITED STATES of America, Plaintiff–Appellee,

v.

Dario ESPINOSA–ALVAREZ, Defendant–Appellant.

No. 87–1107.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1987.

Decided Sept. 9, 1987.*

Opinion Feb. 9, 1988.

---

* The case was decided from the bench at the close of appellant's argument, with a statement that an opinion would follow.

Francis T. O'Brian, McBride, Wheeler & Widegren, Boston, Mass., for defendant-appellant.

Zaldwaynaka L. Scott, Asst. U.S. Atty., U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, COFFEY, and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

Defendant-appellant Dario Espinosa–Alvarez appeals his conviction of possession

of cocaine with intent to distribute and travelling in interstate commerce with the intent to promote and the promotion of an unlawful activity involving a narcotics offense. We affirm.

## I.

On April 23, 1986, Miami Police Detective Claudius Noriega and his partner were on surveillance detail of passengers departing from the Miami International Airport when his partner observed Espinosa making a cash purchase of a first class ticket to Chicago. The detectives had noticed that when Espinosa's brown-beige tote bag passed through the x-ray screening device at the security check point, it contained an object resembling a miniature football. The detectives approached Espinosa after he picked up his bag, but they did not block his path. Speaking in Spanish, Detective Noriega identified himself and his partner to Espinosa and asked him whether he would be willing to speak to them, and Espinosa agreed. Detective Noriega asked Espinosa what his destination was, and Espinosa responded that he was going to Chicago. When asked separately about the length of his stay and where he was going to stay, Espinosa hesitated before answering each question. He responded that he would be in Chicago for three days and staying with an uncle.

Detective Noriega asked Espinosa if he could see Espinosa's airline ticket and some identification. Espinosa handed him the ticket and a Florida driver's license which Noriega reviewed and returned. The detective testified that Espinosa became nervous and his hands were shaking as he put the license away. Noriega asked Espinosa if he would agree to let him search his bag and advised him that he could refuse if he so desired, and Espinosa refused. Espinosa asked the detectives in English if everything was okay and could he leave. Noriega responded yes and Espinosa left to board the plane. The conversation between Noriega and Espinosa took place in a public area and lasted two minutes or less, and at no time did the detectives, who were dressed in plain clothes, display any weapons.

After airline personnel verified that Espinosa had boarded the plane, Noriega called the Chicago Drug Enforcement Administration to relay the information regarding Espinosa's purchase in cash of a one-way ticket, his observation of Espinosa's nervousness and hesitation in answering questions, and Espinosa's refusal to consent to a search of his tan tote bag which contained a large bulge-like object. Noriega also provided the DEA office with a physical description and date of birth of the passenger. A secretary at the DEA relayed this information to DEA Senior Special Agent Bob Fulkerson, who was at the airport to observe passengers arriving on Espinosa's flight. At this time, Fulkerson was accompanied by three DEA special agents. It was Fulkerson's practice to monitor this flight because it arrives nonstop from Miami, a major source city for drugs transported into the United States.

As the passengers from the flight entered the lounge area of the International Terminal, a public area with seating available, Fulkerson observed a man walk into the lounge area who matched the physical description supplied from Miami—5'6″ tall, 160 pounds, dark hair, and twenty-eight years old, wearing a multi-colored striped shirt, gray corduroy pants, and gray boots and carrying a tan tote bag. The man looked directly at Fulkerson and hastened his pace past Fulkerson and two other agents. As the man continued through the lounge area, Fulkerson approached him from the side, displayed his badge, and identified himself as a federal agent. In the presence of one other agent, Fulkerson asked whether the man would consent to talk to him, and the man answered "Sure, what's going on?"

Fulkerson responded that they were conducting a drug investigation but that the man was not under arrest. Fulkerson asked for some form of identification, and the man handed him a Florida driver's license registering the name Dario Espinosa. Fulkerson also asked to see his airplane ticket which Espinosa handed to him along

with his boarding pass. The ticket, listing the name of D. Espinosa, was a one-way cash ticket purchased that day. Fulkerson returned Espinosa's license, ticket, and boarding pass to him.

Fulkerson noticed that Espinosa's hands were shaking as he received the items. Fulkerson also observed that Espinosa was not appropriately dressed for the cool weather, wearing only a short sleeve shirt and corduroy pants, and that the tote bag on Espinosa's shoulder did not appear full. When Fulkerson asked Espinosa if he had any additional baggage, Espinosa said no. Fulkerson asked Espinosa how long he was staying in Chicago, and Espinosa responded two days. Fulkerson observed that Espinosa spoke in a low, quivering voice, was very nervous, and hesitated before he answered the questions.

Fulkerson asked Espinosa about his job, and Espinosa replied he was a tow truck driver. At that point Fulkerson asked Espinosa if he was carrying any drugs, and Espinosa answered no, that he only had clothes in his bag. Fulkerson asked if Espinosa would consent to a search of the bag and informed him that the search was voluntary and he need not consent. Espinosa responded that a police officer in Miami had searched the bag and that he would not consent to another search. Because this statement was inconsistent with the information received from the Miami police detective, one of the special agents informed Espinosa that there was reason to believe the bag contained drugs. The special agent told Espinosa that he could leave, but that the bag would be detained for a "sniff test" by a narcotics detection dog. Espinosa was informed that if the dog did not alert to the bag, it would be returned. Espinosa declined a receipt for the bag when asked, and one of the special agents gave him a business card to inform him where the bag was. The agents assumed custody of the bag, and Espinosa left the immediate area.

The entire conversation between Espinosa and the agents in the lounge area lasted four to five minutes. At no point during the conversation did any agent physically block Espinosa's path, prevent him from continuing on his way into the lounge area, or physically touch him. Other people were present, and Espinosa was never asked to accompany the agents to another area. During the conversation with the agents, Espinosa made no attempt to walk away nor indicate any desire to leave or discontinue the conversation. Espinosa displayed no problems understanding Fulkerson. At no point was a weapon displayed to Espinosa, and the agents did not raise their voices above a conversational level.

The DEA dog performed the "sniff test" a few moments later and smelled drugs, and Espinosa was arrested as he left the International Terminal. A short time thereafter, Espinosa consented to a search of his bag which contained two packages of cocaine, one weighing two kilograms and the other weighing one kilogram. Espinosa was charged with possessing with intent to distribute cocaine and travelling in interstate commerce with the intent to promote and the promotion of an unlawful activity involving a narcotics offense. The district court denied Espinosa's motion to suppress the cocaine and statements he made to the agents, finding in pertinent part that the encounter at the airport did not constitute a search, seizure, or arrest and that the detention of the bag and the sniff test were lawful and based on a reasonable suspicion that the bag contained contraband. At the conclusion of a bench trial on stipulated testimony, the district court found Espinosa guilty beyond a reasonable doubt on both counts.

On January 14, 1987 Espinosa was sentenced on Count One to a term of 10 years imprisonment and a special parole term of life. On Count Two, the imposition of sentence was suspended and the defendant was placed on five years probation. Both sentences were to run consecutively. Espinosa was also assessed the sum of $50.00 on each of Counts One and Two.

## II.

The first issue we address on appeal is whether Espinosa was unlawfully seized at O'Hare International Airport be-

fore the search of his travel bag. The proper test for determining whether a given police-citizen contact rises to the level of a Fourth Amendment seizure is an objective one, and "if, in the totality of the circumstances, a reasonable person would not believe that his freedom of movement is restrained, or believes that he remains at liberty to disregard a police officer's request for information, a seizure has not occurred." *United States v. Dyer*, 784 F.2d 812, 815 (7th Cir.1986); *see also United States v. Borys*, 766 F.2d 304, 308 (7th Cir.1985), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986). Relevant factors in determining whether a reasonable person would feel free to leave include the conduct of the police, the characteristics of the individual citizen, and the physical surroundings of the encounter. *Id.* at 309. The question of whether the encounter between Espinosa and the DEA agents rose to the level of a seizure under this test is a factual one, dependent on the circumstances of each case; accordingly, our standard of review is a limited inquiry into whether the decision of the district court was clearly erroneous, and requires that particular deference be given to the district judge who had the opportunity to hear the testimony and observe the demeanor of the witnesses. *United States v. Black*, 675 F.2d 129, 134 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983).

■ We are convinced that the encounter between Espinosa and the DEA agents did not rise to the level of a seizure. The agents did not display weapons, did not raise their voices above a conversational level, did not threaten Espinosa, and did not interfere with his freedom to leave. The encounter with the law enforcement officers was brief, and Espinosa's ticket and identification were returned to him in a short space of time. We find no error with

the district court's findings vis-a-vis the conduct of the officers and agree with its finding that Espinosa's freedom was not restrained by an overbearing show of authority.[1]

Courts have also looked to the characteristics of the defendant in seeking to determine whether even a facially innocuous encounter might, under the circumstances, have overborne the citizen's freedom to ignore the officer and proceed on his way. For example, in *United States v. Patino*, 649 F.2d 724 (9th Cir.1981), the court affirmed a trial court's finding that an individual had been restrained by a request for an interview when she had problems understanding the English language, and was an alien who might therefore have felt a greater compulsion to comply with the request of the police. In contrast to *Patino*, the record in this case reveals that Espinosa did not appear to have any problem understanding English. Nothing in the record demonstrates that defendant-appellant Espinosa was so naive or vulnerable to acts of coercion that special protection from police contacts rising to the level of a seizure was required by the Fourth Amendment.

The final element courts have examined in determining whether a police-citizen encounter was voluntary or coerced is the physical setting in which the encounter took place. Here, the encounter occurred in a public area with other people nearby, and Espinosa was not asked to move to a more private area for questioning. We conclude, therefore, that the agents' contact with Espinosa during the events in question did not constitute a seizure triggering the protections of the Fourth Amendment.

### III.

■ Espinosa submits that the detention of his luggage by the DEA agents was not

---

1. Espinosa contends that his encounter with the DEA agents rose to the level of a seizure because the O'Hare encounter was the second one Espinosa experienced, and "at some point the average citizen is going to interpret repeated police advancements as a restraint on his liberty." We offer no opinion on the question of how many repeated police initiated contacts might constitute a seizure. We are convinced that under the facts of this case, the second encounter between Espinosa and law enforcement officials did not overbear on Espinosa's freedom to walk away and did not rise to a level of a seizure.

supported by a reasonable and articulable suspicion that it contained contraband. In determining whether there exists a reasonable suspicion of criminal activity, a court must consider the totality of the circumstances. *United States v. $73,277, United States Currency,* 710 F.2d 283, 290 (7th Cir.1983) (citing *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). Among the circumstances that can give rise to reasonable suspicion are the officer's experience and knowledge of the methods used in drug courier activity, characteristics of persons engaged in such illegal practices, (i.e., the drug courier profile),[2] the behavior of a suspect who appears to be evading police contact, and the suspect's efforts to conceal the truth during the police-citizen encounter. *$73,277, United States Currency,* 710 F.2d at 290 (citing *United States v. Moya,* 704 F.2d 337, 343 (7th Cir.1983)).

■ In the instant case, Agent Fulkerson and his partners were aware of the following information at the time the tote bag was seized: (1) Espinosa arrived from Miami, a major source city for drugs; (2) Espinosa purchased a one-way ticket in cash to Chicago earlier that day; (3) x-ray screening revealed that his luggage contained an object resembling a miniature football; (4) Espinosa appeared nervous and hesitated before answering questions from Noriega in Miami; (5) although Espinosa stated he planned to stay in Chicago for two days, his luggage did not appear full, he carried no additional luggage, and he was inappropriately dressed for cool weather; (6) Espinosa spoke in a low, quivering voice, his hands were shaking, and he was nervous and hesitated before answering questions; (7) Espinosa's statement that his bag had already been searched in Miami was inconsistent with the information received from the Miami police detective.[3] We hold these factors, in the aggregate, were more than sufficient to justify the seizure of the tote bag while the agents attempted to verify or dispel their well-founded suspicions.

## IV.

The judgment of the district court is AFFIRMED.

---

**2.** In *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the Supreme Court noted that the drug courier profile is an abstract of characteristics typical of persons transporting illegal drugs. In Royer's case, the detectives' attention was attracted by the following facts which were considered to be within the profile: (a) Royer was carrying American Tourister luggage, which appeared to be heavy, (b) he was young, apparently between 25–35, (c) he was casually dressed, (d) he appeared pale and nervous, looking around at other people, (e) he paid for his ticket in cash with a large number of bills, and (f) rather than completing the airline identification tag to be attached to checked baggage, which had space for a name, address, and telephone number, he wrote only a name and the destination. *Id.* at 493 n. 2, 103 S.Ct. at 1322 n. 2.

**3.** Espinosa argues that the district court's finding that he lied to the DEA agents regarding a prior search is not supported by the record. The district court's finding on this issue was supported by Fulkerson's testimony and thus it is not clearly erroneous, and we will not retry issues of fact or substitute our judgment with respect to such issues for that of the trial court. *See United States v. $84,000 United States Currency,* 717 F.2d 1090, 1096 (7th Cir.1983), *cert. denied,* 469 U.S. 836, 105 S.Ct. 131, 83 L.Ed.2d 71 (1984).

