UNITED STATES of America,
Plaintiff–Appellee,

v.

Winston SULLIVAN,
Defendant–Appellant.

No. 89–2242.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 10, 1990.

Decided May 29, 1990.

Thomas M. Durkin, Ted S. Helwig, Loretta H. Davenport, Asst. U.S. Attys., Chicago, Ill., for plaintiff-appellee.

Gwendolyn D. Anderson, Anderson & Associates, Chicago, Ill., for defendant-appellant.

Before POSNER, RIPPLE, and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

Winston Sullivan was stopped by undercover agents at Union Station in Chicago on January 12, 1988. A subsequent search of a bag that Mr. Sullivan had been carrying disclosed one and one-half kilograms of 95% pure cocaine. Prior to trial, Mr. Sullivan moved to suppress the cocaine on the ground that it was the fruit of an illegal seizure. The district court denied this motion. Mr. Sullivan subsequently was found guilty of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846, possession with intent to distribute cocaine in violation of 21 U.S.C. § 841, and interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952.

On appeal, Mr. Sullivan claims that the district court erred in denying his motion to suppress and in not granting him a downward departure from the sentencing guidelines. He also asserts that there was insufficient evidence to convict him of conspiracy. We reverse the judgment of the district court with respect to the conspiracy count and remand the case for resentencing.

I

BACKGROUND

A. *Facts*

On January 12, 1988, Officer George Graham was monitoring incoming trains at Union Station in Chicago. Officer Graham's attention first was drawn to Mr. Sullivan when another male passenger walking in front of Mr. Sullivan turned around as the two of them disembarked from their train. The two men conversed briefly and then separated. Officer Graham and another officer followed Mr. Sullivan, and two other officers followed the other man. It later was determined that the other man had boarded the train in Kansas City and apparently was not acquainted with the defendant except for a brief conversation on the train. No charges ever were filed against him, nor was there any other evidence linking the two men.

Officer Graham followed the defendant into the train station. The defendant was carrying a duffle bag. He made eye contact with the officer and quickly looked away. The defendant then went to a public telephone. Officer Graham testified that the defendant did not put any money in the phone, but just held the receiver to his ear and looked around the station. When the defendant once again saw Officer Graham, he "huddled to the phone" and turned his back. Tr. at 9. He then hung up the phone and walked quickly toward the exit of the station.

Officer Graham approached the defendant near the exit, identified himself, and asked if the defendant would speak to him. The defendant agreed. Officer Graham requested to see his train ticket, and observed that it was a one-way ticket from Los Angeles and had been purchased on the day of departure for cash. He returned the ticket to Mr. Sullivan. Officer Graham asked Mr. Sullivan what he was doing in Los Angeles, and Mr. Sullivan responded that he was visiting friends. When Officer Graham asked him the

names of the friends, Mr. Sullivan said he could not remember.

Officer Graham testified that the defendant then asked why he had been stopped, and Officer Graham replied that he was conducting a narcotics investigation. The defendant "looked away and then he looked at the ground and could not maintain eye contact with" Officer Graham. Tr. at 14. Officer Graham told the defendant that he was not under arrest, that the bag would be detained to check for narcotics, but that the defendant was free to leave. The defendant asked if he could speak to his lawyer. Officer Graham led him to the public phones, and the defendant placed money into the phone and talked with his mother.[1]

Officer Graham testified that when the defendant terminated his phone conversation, he told the officers that they could have his bag. Mr. Sullivan claims that his mother told him on the phone not to give over the bag, that he reached for the bag, but the officers refused to let him take it. Everyone agrees that Officer Graham then informed Mr. Sullivan that he could stay while a narcotics dog smelled the bag, and that Officer Graham offered him a receipt for the bag. Instead, Mr. Sullivan left the train station.

The officers took the bag to a police facility. A trained narcotics dog, Rex, positively indicated the presence of narcotics in the bag. The officers obtained a search warrant the next day, opened the bag, and discovered the cocaine.

## B. *Disposition in District Court*

Mr. Sullivan was charged with conspiracy to possess with intent to distribute cocaine, possession with intent to distribute cocaine, and interstate travel in aid of racketeering. The defendant moved to suppress the cocaine on the ground that the officers did not have probable cause to stop him at the train station. The district court denied this motion.

Mr. Sullivan was found guilty following a jury trial. He was sentenced to five years in prison and ten years of supervised release on Count 2 (possession with intent to distribute cocaine), and five years probation on Counts 1 and 3, to run concurrently with the supervised release. He was resentenced on June 13, 1989 pursuant to the sentencing guidelines, to concurrent terms of seventy-eight months on all three Counts and four years of supervised release following release from incarceration. The district court rejected defendant's request for a downward departure and imposed a sentence within the guideline range.

## II

## ANALYSIS

### A. *Suppression of Evidence*

We turn first to Mr. Sullivan's argument that the district court erred in not suppressing the narcotics evidence.

### 1.

Mr. Sullivan asserts, as he did in the district court, that a seizure took place when he was questioned at Union Station, and that the officers did not have a reasonable suspicion of illegal activity.

■ The fourth amendment to the Constitution of the United States protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." In arguing that he was unreasonably seized, it is axiomatic that Mr. Sullivan must first succeed in proving that his encounter with the officers at Union Station was a "seizure." If, however, Mr. Sullivan consented to the encounter, we have repeatedly held that such a situation is not a "seizure" for purposes of the fourth amendment. *See, e.g. United States v. Jaramillo*, 891 F.2d 620, 625 (7th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1791,

---

[1] Officer Graham testified that the defendant made *two* phone calls. The defendant testified that he made just one phone call to his mother, in order to get his lawyer's phone number. Instead, he informed his mother of his situation and asked her to call his attorney. This factual dispute is of no consequence to the resolution of this case.

108 L.Ed.2d 792 (1990); *United States v. Dunigan*, 884 F.2d 1010, 1015 (7th Cir. 1989); *United States v. Teslim*, 869 F.2d 316, 321 & n. 6 (7th Cir.1989); *United States v. Espinosa–Alvarez*, 839 F.2d 1201, 1205 (7th Cir.1987). A person is "seized" when " 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)); *see also Teslim*, 869 F.2d at 321.

The district court, after conducting a suppression hearing in which it heard and evaluated the testimony of Mr. Sullivan and the police officers, found that Mr. Sullivan consented to the questioning by the officers.

> Based upon the defendant's own testimony, it seems to me that it's clear that the defendant was free to leave during his encounter with the police.

> The defendant is not an unsophisticated individual. I observed him testify. He is bright. He is articulate. He is a man of some stature physically, a former marine. It seems to me that it is clear that he was not intimidated in giving his consent to the stop and conversation but, in fact, did so.

Tr. at 100–01.

The district court's decision on the issue of consent is a determination of fact. "[A]ccordingly, our standard of review is a limited inquiry into whether the decision of the district court was clearly erroneous, and requires that particular deference be given to the district judge who had the opportunity to hear the testimony and observe the demeanor of the witnesses." *Espinosa–Alvarez*, 839 F.2d at 1205; *see also Dunigan*, 884 F.2d at 1014; *United States v. Novak*, 870 F.2d 1345, 1350 (7th Cir. 1989); *Teslim*, 869 F.2d at 321.

▇ The record clearly supports the district court's finding that Mr. Sullivan was free to leave at any time and thus consented to the encounter. Officer Graham testified that he told Mr. Sullivan several times that Mr. Sullivan was not under arrest and was free to leave.[2] Officer Graham informed the defendant that he could leave, but that the defendant's bag would be detained.[3] Furthermore, the record indicates that the officers never drew their weapons and did not impede Mr. Sullivan from leaving. The entire encounter occurred in an open, public place. Moreover, even by Mr. Sullivan's account, the officers took pains to explain to the defendant the procedures that they were following to detain his bag. We conclude that there was no objective reason for Mr. Sullivan to feel that he was not free to leave. In addition, the district court properly considered the character of the defendant to determine if an encounter in which the police have displayed no objective coercion might "have overborne the citizen's freedom to ignore the officer and proceed on his way." *Espinosa–Alvarez*, 839 F.2d at 1205. The defendant in this case is a former marine who is approximately six feet tall and weighs over 200 pounds. The district court found him to be

---

2. In fact, Mr. Sullivan admitted during the suppression hearing that Officer Graham had informed him that he was not under arrest:

   Q. You asked him [Officer Graham] whether you were under arrest, and he told you you weren't, right?
   A. Right.
   Q. In fact, he told you that several times throughout the time that you talked to him?
   A. Yes. That's why it took so long for me to find out what was the procedure as far as detaining my bag if I wasn't under arrest.
   Q. He told you that he had a right to detain the bag but that you were free to leave?
   A. Yes.
   R. 76 at 65.

3. There is some disagreement regarding Officer Graham's taking possession of the bag. Mr. Sullivan testified that Officer Graham took the bag away from him. Officer Graham testified that the defendant placed the bag down while making the telephone call to his mother. When he got off the phone, the defendant told Officer Graham that he could have the bag.

   The district court concluded that the testimony of the police officer was more credible than Mr. Sullivan's testimony. The defendant has presented no facts that would move us to disturb this credibility determination by the district court.

articulate and intelligent. Our review of the record convinces us that the district court's finding that the encounter was consensual is not clearly erroneous.

### 2.

█ Mr. Sullivan also objects to the seizure of his bag. He first argues that the evidence did not support the officers' suspicion that the bag contained narcotics.[4] Mr. Sullivan asserts that "the authorities did not have an iota of proof or suspicion that Sullivan's luggage contained any illicit substance." Appellant's Br. at 17. However, we believe that the district court properly concluded that the evidence supporting the officer's suspicion justified the use of a narcotics dog. At the time they detained the luggage, the officers knew that Mr. Sullivan was travelling from a "source city." He had purchased his one-way train ticket on the date of departure and had paid cash. He carried only one small bag, despite the long distance of the trip. He appeared to divert his eyes from those of the officers when they followed him in the station and also appeared to pretend to make a telephone call without actually placing any money in a public phone. He appeared nervous to the officers when they questioned him, and he could not remember the names of the friends he claimed to visit in Los Angeles.

█ In reviewing whether there was reasonable suspicion of criminal activity to justify detention of an individual's luggage, we must look at the totality of the circumstances. *United States v. Edwards*, 898 F.2d 1273, 1277 (7th Cir.1990); *United States v. Skidmore*, 894 F.2d 925, 928 (7th Cir.1990); *United States v. Espinosa–Alvarez*, 839 F.2d 1201, 1206 (7th Cir.1987). Any one of these suspicious elements, by itself, may be inadequate to raise reasonable suspicion, and in fact. may be "quite consistent with innocent travel." *United States v. Sokolow*, — U.S. —, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989). But we

believe that, taken together, these factors adequately support the officers' suspicion. *See id.* (while one factor may be innocent, "taken together they amount to reasonable suspicion"). The detention of Mr. Sullivan's bag, therefore, was not impermissible.

Mr. Sullivan's second argument is that the duration of the detention of his bag was impermissible. The Supreme Court in *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), determined that a police officer may detain briefly a traveller's luggage if he reasonably believes that the luggage contains contraband. *Id.* at 706, 103 S.Ct. at 2644. In that case, the Court concluded that a ninety-minute detention was unreasonable. *Id.* at 709–10, 103 S.Ct. at 2645–46. However, the Supreme Court noted that, in assessing the length of detention, it is proper to "take into account whether the police diligently pursue their investigation." *Id.* at 709, 103 S.Ct. at 2645.

█ The record indicates that Officer Graham offered to have the dog-sniff test performed at Union Station, that he informed the defendant that a dog was in the vicinity and that the inspection would not take long. Mr. Sullivan did not dispute that officer Graham imparted this information to him. The defendant declined this offer and left the station. Instead of conducting the test at the station, the police then took the bag to a police facility that was set up as a mock apartment, placed the bag in one of the rooms, and brought in a narcotics dog. Officer Graham testified that the dog-sniff test occurred approximately forty-five minutes after the defendant gave him the bag.

As the Supreme Court noted in *Place*, seizure of a traveler's luggage "can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return." *Place,*

---

**4.** The inspection method determines the level of suspicion required: if the officer physically searches the luggage, there must exist probable cause; if a narcotics dog is used, it would not constitute a "search" due to the discrete and

nonobtrusive nature of the investigation and thus less than probable cause is appropriate. *United States v. Place,* 462 U.S. 696, 706–07, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110 (1983).

462 U.S. at 708, 103 S.Ct. at 2645. Here Mr. Sullivan was informed that the inspection could take place in a short period of time. He not only declined to wait but also effectively abandoned the bag by declining to accept a receipt. Under the circumstances presented here, therefore, we cannot say that the delay was impermissible.

### B. *Sufficiency of Evidence*

Mr. Sullivan submits that the evidence was insufficient to support, as a matter of law, his conviction of conspiracy. Specifically, Mr. Sullivan contends that there was no evidence admitted that would support a jury's conclusion that he was involved in a joint scheme with another individual. Mr. Sullivan bears a heavy burden in challenging his conviction based on insufficiency of evidence. " 'The test is whether after viewing the evidence in the light most favorable to the government, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " *United States v. Herrero,* 893 F.2d 1512, 1531 (7th Cir.1990) (quoting *United States v. Pritchard,* 745 F.2d 1112, 1122 (7th Cir.1984) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original))).

■ A conspiracy is a " ' " "combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." ' " *United States v. Whaley,* 830 F.2d 1469, 1473 (7th Cir.1987) (quoting *United States v. Herrera,* 757 F.2d 144, 149 (7th Cir.1985) (quoting *United States v. Mayo,* 721 F.2d 1084, 1088 (7th Cir.1983))), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988). As the government correctly states in its brief, the " 'essential elements of conspiracy under [21 U.S.C. § 846] are the existence of an agreement between two or more individuals, with the intent to commit an offense in violation of the Controlled Substance Act.' " Appellee's Br. at 17 (quoting *United States v. Sweeney,* 688 F.2d 1131, 1140 (7th Cir.1982)). The government must prove that the defendant (1) knew of the conspiracy, and (2) intended to associate himself with the criminal scheme. *United States v. Vega,* 860 F.2d 779, 792 (7th Cir.1988). The basis for punishing a conspiracy separate from the underlying crime is the recognition that a combination of criminals can do more harm than individual criminals acting alone. *United States v. Manzella,* 791 F.2d 1263, 1265 (7th Cir.1986).

■ "The nature of a conspiracy is such that its existence and the involvement of co-conspirators in it must often be proved by circumstantial evidence." *Whaley,* 830 F.2d at 1473. As the court noted in *Vega,* " 'relying on common sense and taking judicial notice of the clandestine and life-threatening manner in which a drug conspiracy operates, it is ridiculous to presume that the government could obtain witnesses with firsthand knowledge of the group's activities.' " 860 F.2d at 793 (quoting *United States v. Zambrana,* 841 F.2d 1320, 1331–32 (7th Cir.1988)).

> "Not only is the use of circumstantial evidence permissible, but 'circumstantial evidence "may be the *sole support* for a conviction." ' " [*United States v.*] *Nesbitt,* 852 F.2d [1502,] 1510 [ (7th Cir. 1988) ] (quoting *United States v. Williams,* 798 F.2d 1024, 1042 (7th Cir. 1986) (dissenting opinion) which quoted, in turn, *United States v. McCrady,* 774 F.2d 868, 874 (8th Cir.1985)).

*Vega,* 860 F.2d at 793–94 (emphasis by *Nesbitt* court). "The government need not establish that there existed a formal agreement to conspire; circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct may serve as proof." *United States v. Redwine,* 715 F.2d 315, 320 (7th Cir.1983), *cert. denied,* 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984). Nor is it necessary that the government prove that the defendant knew the other members of the conspiracy or its details. *United States v. Missick,* 875 F.2d 1294, 1297 (7th Cir.1989); *United States v. Grier,* 866 F.2d 908, 924 (7th Cir.1989). On the other hand, as the court noted in *Whaley,* the government must establish that the defendant's

relationship with the other conspirators "was more than a mere association." 830 F.2d at 1473; *see also United States v. Percival*, 756 F.2d 600, 610 (7th Cir.1985). Certainly, "proof of a mere buyer-seller relationship, without more, is insufficient to support a drug conspiracy conviction." *United States v. Douglas*, 874 F.2d 1145, 1151 (7th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 126, 107 L.Ed.2d 87 (1989); *see also United States v. Koenig*, 856 F.2d 843, 854 (7th Cir.1988). "This is because the crime of conspiracy involves a concert of action between two or more persons for a common purpose." *United States v. Molinaro*, 877 F.2d 1341, 1347 (7th Cir.1989).

■ On the basis of the record before us, we must conclude that, as a matter of law, the evidence before the court cannot support a conviction of *conspiracy* with intent to distribute. The government argues that the quantity and purity of the drugs involved indicate they were intended for resale. It also notes that Mr. Sullivan's method of transport, his lack of baggage and funds, as well as his use of an alias fit a recurring pattern of a drug courier. During trial, at closing argument, the Assistant United States Attorney described to the jury the basis for the conspiracy charge:

> The defendant was here by himself when he came into Union Station, but you can use your common sense, ladies and gentlemen, when you do go back there and deliberate. Certainly the defendant didn't just cook this up himself and make it himself.
>
> He got it from someone, and he intended to deliver or sell it to someone here in Chicago. That's the kind of conspiracy we are talking about. The indictment alleges he conspired with people, but we don't know who that is.

Tr. at 177. The evidence is sufficient to charge and convict Mr. Sullivan of possession with intent to distribute cocaine. But this evidence, without more, does not permit the jury to conclude that Mr. Sullivan *conspired* with others to commit that crime. One might well infer that he bought the contraband from someone and that he planned to sell it. We can hypothesize that his activities were part of a conspiracy. But such a hypothesis would be grounded on " 'piling inference upon inference,' " a practice disapproved of by the Supreme Court. *Anderson v. United States*, 417 U.S. 211, 224, 94 S.Ct. 2253, 2262, 41 L.Ed.2d 20 (1974) (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 711, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943)); *see also United States v. Bradberry*, 517 F.2d 498, 500 (7th Cir.1975) (Stevens, J.). Criminal convictions are based on facts ... not conjecture. Accordingly, we reverse the judgment of conviction for conspiracy.

Because we are reversing one of Mr. Sullivan's three convictions, this case must be remanded to the district court for resentencing.[5] *See United States v. Shue*, 825 F.2d 1111, 1113–14 (7th Cir.), *cert. denied,* 484 U.S. 956, 108 S.Ct. 351, 98 L.Ed.2d 376 (1987); *United States v. Manzella*, 791 F.2d 1263, 1270 (7th Cir.1986).

### Conclusion

For the preceding reasons, we affirm Mr. Sullivan's conviction of possession with intent to distribute cocaine and interstate travel in aid of racketeering, but reverse his conviction of conspiracy to possess with intent to distribute cocaine.

REVERSED IN PART AND REMANDED FOR RESENTENCING.

---

5. Because we are remanding this case, we do not reach Mr. Sullivan's argument that the district court erred in not granting him a downward departure due to his family ties to the community, educational background, and lack of prior criminal activity. Moreover, we recently determined that we do not have jurisdiction to hear appeals of this nature. *See United States v. Franz*, 886 F.2d 973 (7th Cir.1989).