NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued February 14, 2017
Decided September 20, 2017

**Before**

ILANA DIAMOND ROVNER, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 16-1520

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 1:12-cr-00957-4 |
| WILLIAM CAMPBELL, *Defendant-Appellant.* | Sharon Johnson Coleman, *Judge*. |

**O R D E R**

A jury convicted William (a.k.a. Willie) Campbell on charges of wire fraud and access device fraud based on his participation in a fraudulent scheme to use gift cards acquired with stolen credit card information to purchase large amounts of merchandise at various retail stores and then sell that merchandise. *See* 18 U.S.C. §§ 1343, 1029(a)(2). So far as the record reveals, Campbell's role in the scheme was limited to purchasing more than $100,000 worth of cigarettes at Sam's Club stores with some 1,200 gift cards over a period of six months and assisting a co-defendant to deliver the cigarettes to a

convenience market on at least one occasion. Campbell contends on appeal that the government's evidence was insufficient to establish that he knew the gift cards he was using to purchase the cigarettes were obtained with stolen credit card numbers and thus to establish that he harbored an intent to defraud the victims of the scheme. Campbell also argues that plain error occurred in the admission of testimony concerning evidence seized in the search of a co-defendant's residences and in the submission of the case to the jury based on proof that fatally varied from the modified version of the indictment that was given to the jury for reference in its deliberations. We affirm the judgment.

## I.

In view of Campbell's challenge to the sufficiency of the evidence underlying his convictions, we recount the facts in the light most favorable to the government. *E.g.*, *United States v. Betts-Gaston*, 860 F.3d 525, 529 (7th Cir. 2017).

Campbell was one of five people charged as participants in a three-year scheme to use credit card information stolen from 30,000 or more account-holders to manufacture fraudulent credit and gift cards (both of which qualify as access devices under federal law) and use those cards to purchase additional gift cards and merchandise at various national retailers, including Walmart, Home Depot, Family Dollar and Sam's Club. The four other participants obtained stolen credit card data, encoded valueless credit cards and gift cards with that data, and then used those cards to obtain retail gift cards that could be used to purchase store merchandise, in some instances by additional individuals they recruited into the scheme. Those four defendants all pleaded guilty; only Campbell went to trial.

Campbell's role in the scheme was limited to the purchase of merchandise at Sam's Club stores using Walmart gift cards (which Walmart refers to as "shopping cards")[1] that had been purchased with stolen credit card information. Like a number of other warehouse club retailers, Sam's Club requires a customer to purchase a membership in order to shop at its stores. Campbell established an individual membership in his own name in November 2010, using his driver's license as confirmation of his identity. Sam's Club asks shoppers to provide their membership cards to cashiers for swiping whenever merchandise is purchased, which makes it

---

[1] The Sam's Club chain is owned by Walmart.

possible for the company to create a record of how often each customer shops at a given store, what items he has purchased, and how he paid for his purchases.

In the six months after he became a Sam's Club member, Campbell visited Sam's Club stores in suburban Chicago on some 44 dates to purchase Newport 100's cigarettes in bulk quantities.[2] The individual purchases ranged in scale from hundreds to thousands of dollars' worth of cigarettes at a time. With one exception, Campbell made these purchases at a Sam's Club store in Addison, Illinois, roughly 18 miles from his home in Chicago; on one occasion, he patronized the Sam's Club in Woodridge, Illinois, some 22 miles from his home. There were several Sam's Club locations significantly closer to his residence than either of these stores, but Campbell did not patronize those stores. In total, Campbell purchased $101,888 worth of cigarettes. Campbell made these purchases using a total of 1,208 Walmart gift cards.[3] In certain instances, the gift cards Campbell used had been purchased just a day or so earlier. Eighty-five percent of the cards Campbell used (1,032 of 1,208) had a value of $90. The last of the purchases took place on May 14, 2011. The record indicates that Campbell purchased additional items on June 21, 2011, using electronic food stamp benefits as tender.

Because Campbell purchased the cigarettes using his individual Sam's Club membership account rather than a business account, he paid sales taxes on these purchases. Had he instead opened a business account with Sam's Club and made purchases (for resale) with that account, he would have paid no sales taxes.

There is no dispute that all of the 1,208 gift cards Campbell used to purchase the cigarettes were themselves acquired using credit card data stolen from 299 different account holders. By way of example, two of the victims whose credit card numbers had been used to purchase these gift cards (one from the District of Columbia area and one from South Carolina) testified their credit cards were in their own possession at the time the gift cards were purchased in Illinois, that they did not purchase the gift cards, that

---

[2] Campbell typically purchased cigarettes by the case. A case of Newport 100's contains 30 cartons, with each carton comprising 10 packages of 20 cigarettes per package.

[3] It appears that Campbell used cash to complete certain of his cigarette purchases, but gift cards were used to pay for all but a few hundred dollars' worth of the cigarette purchases in total.

they did not authorize anyone else to make these purchases, and that their information had been stolen.

On eight of the occasions that Campbell purchased cigarettes at the Addison, Illinois Sam's Club, records reveal that his co-defendant Ike Jeffries made cigarette purchases within minutes of Campbell's transactions and at an adjacent cash register. (Cigarettes are separately stocked and sold at a tobacco products center within Sam's Club stores.) The parties appear to agree that Jeffries was a more culpable participant in the scheme than Campbell, if not the most culpable among the five persons charged. Store video from December 7, 2016, showed Campbell and Jeffries standing side by side while making their cigarette purchases on that date and at one point swapping gift cards with one another as they completed their respective transactions. The video also showed them arriving at the store together and leaving together with a cart full of cigarettes. Both purchased several thousands of dollars' worth of cigarettes that day using dozens of gift cards.

By December 7, Sam's Club personnel had become suspicious of the large-scale cigarette purchases being made at the Addison store.[4] A Walmart fraud investigator followed Campbell and Jeffries when they left the Addison Sam's Club on December 7. They drove to a food market on Chicago's west side, unloaded the cigarettes from their vehicle, and delivered the cigarettes to the store. The investigator used his Blackberry device to take photographs of Campbell and Jeffries doing this.

Two residences associated with Jeffries were searched pursuant to warrants some 10 months after the last recorded cigarette purchases by Campbell in May 2011.[5] During those searches, investigators seized some eight re-encoded credit cards, multiple Western Union receipts reflecting the transmission of money to Russia, a computerized embossing machine which could emboss numbers onto identification and credit cards, and a laptop computer later determined to contain email exchanges reflecting the fraudulent acquisition of credit card numbers.

---

[4] Jeffries' own purchases at the Addison Sam's Club commenced roughly a month before Campbell's did and continued into July 2011.

[5] A followup search of one of the residences was conducted approximately four months later.

Campbell was tried over a period of three days. Contrary to the government's expectation, none of his co-defendants testified, which required the government to rely more heavily on circumstantial proof of Campbell's knowing participation in the scheme than it otherwise might have done. At the conclusion of the government's case, Campbell moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a), but the district judge denied the motion, reasoning that there was sufficient evidence of his guilt to submit the case to the jury. The jury found him guilty on all three counts in which he was charged.

**II.**

A.      Sufficiency of the evidence

Campbell's lead argument, as we noted above, is that the evidence introduced at trial was insufficient to establish that he knowingly participated in fraudulent conduct. In order to prove Campbell guilty of wire fraud and access device fraud, the government was required to prove, among other elements, that he acted with an intent to defraud. *See United States v. Mullins*, 800 F.3d 866, 870 (7th Cir. 2015) (wire fraud), *cert. denied*, 136 S. Ct. 1235 (2016); 18 U.S.C. § 1029(a)(2) and *United States v. Keita*, 742 F.3d 184, 191 (4th Cir. 2014) (access device fraud). The parties agree that in order to find that Campbell acted with fraudulent intent, the evidence would have to support the notion that he knew the gift cards he was using to make the bulk purchases of cigarettes from Sam's Club were obtained illegally. There is no direct proof of Campbell's knowledge with respect to the provenance of the gift cards. But, of course, circumstantial proof is a perfectly acceptable means of establishing a defendant's knowledge and intent. *See, e.g., United States v. Persfull*, 660 F.3d 286, 294 (7th Cir. 2011) ("[B]ecause direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself.") (quoting *United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010)).

In making his challenge to the sufficiency of the evidence underlying his convictions, Campbell bears a heavy burden. *E.g., United States v. Kohli*, 847 F.3d 483, 489 (7th Cir. 2017), *pet'n for cert. filed* (U.S. June 26, 2017) (No. 17-37). We will overturn his convictions only if the record is devoid of evidence from which a reasonable juror could have found the elements of the offenses to have been proven beyond a reasonable doubt. *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016); *Kohli*, 847 F.3d at 489

(collecting cases). In assessing the sufficiency of the government's proof, we of course consider the evidence in the light most favorable to the government. *E.g., id.* at 489.

Having examined the record, we are satisfied that the proof was sufficient to permit the inference that Campbell knew the gift cards were obtained illegally and thus that he acted with fraudulent intent in using the cards to make the purchases from Sam's Club. First, the purchases themselves were unusual in their frequency and quantity. Campbell had opened an individual rather than a business account with Sam's Club, but he was purchasing large, resale quantities of cigarettes: his individual purchases often exceeded $1,000 in value, and his total purchases over a six-month period exceeded $100,000. His delivery of multiple cases of cigarettes to a Chicago food market with Jeffries on December 7, 2010 confirms that the men were engaged in a commercial (which is not to say legitimate) enterprise, supplying the cigarettes to one or more retailers for resale by those retailers.[6] Yet it is odd, to say the least, that Campbell would not have established a business account for this purpose, which would have enabled him to make the purchases without paying the not-insubstantial sales tax.[7] Second, the use of gift cards to make these purchases was remarkable in and of itself, given the quantities involved. No doubt there are any number of people who use the gift cards they have been given to purchase items for their small businesses. But no Santa gave Campbell $100,000 worth of Walmart gift cards. And no legitimate enterprise uses gift cards as its preferred and regular form of legal tender. The use of 1,208 gift cards, the vast majority of them worth $90 each, to purchase $101,888 worth of cigarettes for resale makes obvious that the cards were a vehicle for money laundering, that is hiding an illicit source of funds. In some instances, the gift cards Campbell was using had been purchased just a day earlier—some of the cards used in the December 7 Sam's Club transaction, for example, had been obtained the evening prior—which makes it highly unlikely that the cards had been purchased legitimately at a discount via eBay or another internet website, as Campbell has suggested. A rational jury could

---

[6] Campbell points out there was no proof that he and Jeffries were paid for the cigarettes they delivered. But that is the obvious inference to be drawn: There is no reason to believe the men would be donating the cigarettes; this was a food market rather than a food pantry. The government did not charge Campbell for any conduct relating to the sale of the cigarettes.

[7] Prior to 2012, the Illinois sales tax on cigarette sales was 98 cents per pack. *See* Rick Pearson and Ray Long, *Lawmakers OK $1-a-pack cigarette tax hike*, CHICAGO TRIBUNE, May 30, 2012, at 4.

conclude, as this jury did, that Campbell knew full well that the gift cards represented the fruits of theft. His documented association and coordination with Jeffries—whom the evidence linked directly to the acquisition of stolen credit card information and the manufacture of credit cards using that data—simply reinforces what Campbell's own conduct evinces: a knowing participation in a scheme to parlay stolen credit card information into large-scale purchases of merchandise for resale.

We do not agree with Campbell's contention that the jury could not rationally find him guilty without resorting to conjecture, and the piling of inference upon inference. In that regard, the proof of Campbell's knowing complicity in the fraudulent scheme is distinguishable from *United States v. Sullivan*, 903 F.2d 1093 (7th Cir. 1990), on which Campbell relies. The charge at issue in *Sullivan* was conspiracy. The defendant had been nabbed in Chicago's Union Station carrying 1.5 kilograms of 95% pure cocaine. We agreed that the proof sufficed to show that he possessed the cocaine with the intent to distribute it, but we discerned no proof that the defendant had engaged in a conspiracy with anyone else in that regard. *Id.* at 1099. The agents who arrested the defendant had seen him speak briefly with another passenger as the two of them disembarked from a train, but beyond that there was no evidence from which one could infer that he had entered into an illicit agreement with anyone else. *Id.* We agreed it was possible that the defendant had obtained the cocaine from someone else and that he planned to sell it to someone; but only hypothesis, rather than actual evidence, suggested that he was conspiring with others. *Id.* In this case, the issue is Campbell's knowledge and intent; it was not necessary for the government to prove that he conspired with anyone. Campbell's own actions in purchasing large quantities of cigarettes with more than a thousand relatively low-value gift cards permit the inference that he knew the source of the cards was illegitimate. His evident collaboration with Jeffries (who himself was purchasing large quantities of cigarettes using gift cards in Campbell's presence on multiple occasions) only strengthens the inference, as it demonstrates Campbell's knowledge that the scheme entailed similar actions by others.

The district court therefore did not err in denying Campbell's Rule 29 motion for a judgment of acquittal. The evidence was sufficient to support the submission of the case to the jury and the jury's decision to convict him on the wire and access device fraud charges.

B.      Admission of evidence seized in search of Jeffries' residences

Campbell next argues that the district court erred in admitting the testimony of U.S. Secret Service Special Agent Krzysztof Bossowski concerning the search of residences associated with Jeffries. The agent testified that in the search they recovered items such as re-encoded credit cards, Western Union receipts showing money sent to Russia, an embossing machine capable of embossing numbers on IDs or credit cards, and a laptop containing email exchanges about buying credit card numbers. Campbell argues that evidence of the search of Jeffries' residences should have been excluded from the trial under Federal Rule of Evidence 403 because any minimal probative value was substantially outweighed by the danger of unfair prejudice and the likelihood that it misled the jury into attributing the seized evidence to Campbell himself. In general, challenges to the district court's decision to allow the evidence are reviewed only for an abuse of discretion, but an even more onerous standard applies here. Because no objection was made during the trial to the introduction of the evidence, we review the admission only for plain error. Under that standard, Campbell must demonstrate that: (1) there was an error that has not been affirmatively waived; (2) the error is clear or obvious, rather than subject to reasonable dispute, such that a district judge should have intervened without being prompted by an objection from defense counsel; and (3) the error affected his substantial rights, which ordinarily means that he likely would have been acquitted absent the error. *United States v. Boswell*, 772 F.3d 469, 476-77 (7th Cir. 2014); *Puckett v. United States*, 556 U.S. 129, 135 (2009). Once those prongs are met, we have discretion to remedy the error, which we should exercise only if the error seriously affected the fairness, integrity or public reputation of the judicial proceedings. *Id.*

With that daunting standard in mind, we consider the Rule 403 challenge here. Because all relevant evidence against a defendant is prejudicial by its nature, Rule 403 protects only from the admission of evidence that is unfairly prejudicial—evidence that will "induce the jury to decide the case on an improper basis rather than on the evidence presented." *Boswell*, 772 F.3d at 476. And because the Rule considers whether the probative value was outweighed by the danger of unfair prejudice, the risk of prejudice that is acceptable varies based on the probative value of that evidence. *Id.*; *United States v. Vargas*, 552 F.3d 550, 557 (7th Cir. 2008).

Campbell argues that even though there was no search of his residence, and no evidence seized from the search of the Jeffries' residences was directly tied to Campbell or the Sam's Club transactions, the government nevertheless was allowed to introduce evidence from the search as evidence against Campbell. He asserts that the evidence had minimal value because it was conducted almost a year after the transactions at

issue concerning Campbell, and complains that "[t]he *only* connection the seized evidence had to Campbell is that he was seen in the company of Jeffries on multiple occasions nearly a year before the date of the search." Defendant-Appellant Brief at 23-24.

That is not an accurate characterization of the evidence. Campbell was indicted along with Jeffries and three others with participating in a wire fraud scheme. Therefore, evidence of the scheme was relevant to Campbell's charge. Moreover, evidence introduced at trial would allow a jury to conclude that Jeffries and Campbell coordinated their activities, and jointly worked to further the scheme by converting gift cards purchased by illegal means into cash by means of the purchase and sale of cigarettes. At trial, there was evidence that Jeffries was physically present at the Addison Sam's Club on eight occasions in which bulk purchases of cigarettes by Campbell occurred. And on one of those occasions, December 7, they were under surveillance and were observed arriving together at Sam's Club, purchasing cigarettes simultaneously and sharing gift cards in the process, departing together and traveling to the convenience store, and unloading those purchases. Additionally, evidence was introduced that the gift cards were used in the Sam's Clubs transactions within a day or two of their purchase. For the December 7 transactions, for instance, gift cards used in the transactions had been purchased within the prior twenty-four hours, and Jeffries and Campbell both used gift cards purchased in that set.

Evidence from the search indicating Jeffries' actions in obtaining the credit information, manufacturing the bogus credit cards, and purchasing the gift cards, is probative because it demonstrates the contours of the scheme. Given the evidence of coordination and communication between Jeffries and Campbell, it is also relevant in establishing Campbell's fraudulent intent. Although the search occurred approximately ten months after the last purchase by Campbell, thus reducing its probative value, records from Sam's Club and Walmart show that Jeffries used cards in the same manner from just prior to Campbell's participation in the scheme until the time of search, thus demonstrating that Campbell joined a scheme that was ongoing and consistent in nature.

Most critically, our review here is not whether we would conclude that the probative value outweighed the risk of unfair prejudice, but rather to determine whether Campbell has demonstrated that the failure to exclude that evidence was plain error. In that context, we would be hard-pressed to determine that any error in admission was so clear or obvious that the district court should have intervened even in

the absence of any objection. But the more significant problem for Campbell in establishing plain error is that he cannot show that the error affected his substantial rights in that he would likely have been acquitted absent the error. Nor can he demonstrate that the error seriously affected the fairness, integrity or public reputation of the judicial proceedings. The government's testimony as to the search was narrow and brief. In a trial transcript that exceeds 500 pages, the testimony regarding the search spans less than two pages, and it was discussed in closing argument for only a few sentences. The government did not introduce into evidence any of the physical items recovered in the search, including the re-encoded credit cards, embossing machine, and email exchanges, nor did it introduce photographs of the items. Moreover, Campbell's conviction for wire fraud did not require any finding that he was involved in the acquisition of credit card information, the manufacturing of new cards, or the purchase of the gift cards. It was enough that he knowingly participated in a scheme to use gift cards unlawfully acquired to purchase cigarettes which were then sold for personal gain. The evidence unrelated to the search is substantial, as set forth in our sufficiency analysis. There is no evidence that Campbell had the income to purchase the gift cards himself that he used at Sam's Club, and his two purchases made by him at Sam's Club using food stamps indicates that he did not. The purchase of such a large quantity of cigarettes without using a business card and thereby avoiding the significant tax on such purchases indicates that the purchases were not made on behalf of a legitimate business. And the odd denomination of $90 for the bulk of those cards indicates an effort to avoid detection by purchasing in smaller amounts. With all of that evidence unrelated to the search, and the minimal role that the search featured in the trial itself, we have no basis to hold that Campbell would have been acquitted absent that evidence, or that the fairness, integrity or public reputation of the judicial proceedings is implicated in his conviction. Accordingly, Campbell has failed to demonstrate that the admission of the search evidence constituted plain error.

## C.     Variance from the indictment submitted to jury

Finally, Campbell argues that the variance between the indictment and the evidence produced at trial was a fatal error. Although the indictment presented to the jury was modified from the original indictment by agreement of the parties, Campbell asserts that the modified indictment nevertheless charged Campbell with a much broader participation in the alleged scheme than the evidence proffered at trial could support. Specifically, he asserts that the modified indictment included the following facts for which no evidence was offered at trial:

(1) in paragraph 3, that the scheme included the manufacture of bogus credit cards by encoding the account information of legitimate credit card accounts onto valueless credit and gift cards obtained from various sources and that those bogus credit cards were used fraudulently to purchase goods and gift cards from retail merchants, with those purchases charged to the victim credit card holders;

(2) in paragraph 5, that as part of the scheme individuals fraudulently obtained information for credit card accounts assigned to legitimate account holders from sources such as individuals who sold such information through the internet;

(3) in paragraph 6, that it was further part of the scheme that individuals distributed the bogus cards to other co-schemers;

(4) in paragraph 7, that as part of the scheme Campbell as well as Jeffries caused those bogus credit cards to be used to purchase Walmart gift cards, with those purchases charged to the account of the victim cardholders;

(5) in paragraph 10, that Campbell and Jeffries, among others, fraudulently converted to their own benefit the goods that they purchased using the victim's credit card accounts;

(6) in paragraph 11, that as part of the scheme, Campbell and Jeffries, among others, misrepresented, concealed and hid, and caused to be misrepresented, concealed and hidden, acts done in furtherance of the scheme and the purposes of those acts.

As a preliminary matter, the notion that no evidence was produced at trial to support those allegations is itself unfounded. In offenses such as this one involving a scheme to defraud, direct evidence of fraudulent intent is often unavailable, and, as we noted above, such intent is instead often established through circumstantial evidence and the inferences drawn from the scheme itself. *See United States v. Persfull, supra*, 660 F.3d at 294 (quoting *United States v. Howard*, 619 F.3d at 727). For instance, when cigarettes are purchased in large quantities and then unloaded at a different store, the jury could determine that Campbell was paid for those cigarettes by that store and in that manner was fraudulently converting the goods for his own benefit. Moreover, the search of the Jeffries' homes provided evidence of the allegations that the scheme included the manufacture of bogus credit cards with an encoding device, that information for the accounts was obtained from sources who sold through the internet, that such cards

were used to purchase Walmart gift cards which were then used to purchase cigarettes, and that those cigarettes were then sold to a third party for personal gain.

But we need not determine whether the challenged allegations in the indictment were supported by trial evidence, because there is no requirement that the evidence at trial match precisely the allegations in the indictment. In fact, that proposition has been repeatedly rejected. *See, e.g., United States v. Miller*, 471 U.S.130, 136-37 (1985); *United States v. LaBudda*, 882 F.2d 244, 249-50 (7th Cir. 1989); *United States v. Ajayi*, 808 F.3d 1113, 1125 (7th Cir. 2015).

Even if Campbell could demonstrate a variance in that the proven elements of the offense are narrower than the allegations in the indictment, that alone would not entitle him to any relief. *See United States v. Cruse*, 805 F.3d 795, 804 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 1699 (2016). "The general rule that allegations and proof must correspond serves the purpose of ensuring that the accused is informed of the charges against him so that he can prepare his defense and so he may be protected against a second prosecution for the same offense." *United States v. Neighbors*, 590 F.3d 485, 498 (7th Cir. 2009). Accordingly, a variance will prove fatal only if it prejudiced the defendant, such as by depriving him of fair notice of the charges against him or by creating the risk of double jeopardy. *Id.; Cruse*, 805 F.3d at 804.

Challenges based on a variance often involve allegations that the evidence at trial was broader than the allegations of the indictment, thus surprising the defendant and forcing him to defend against charges for which he had not prepared. As Campbell recognizes, the variance claim in this case presents a different situation. Campbell argues that the allegations in the indictment were broader, not narrower, in scope than the evidence of wrongdoing presented at trial. He claims that the indictment was referenced by the jurors during deliberations and presented a "story" to them that was broader in scope than the evidence presented at trial. Although the district court informed the jury that the indictment was not evidence, Campbell claims that his right to a fair trial was prejudiced by the inclusion of the allegations. Because Campbell failed to raise this argument to the district court, we review only for plain error, under which we will not reverse unless the alleged error is clear or obvious and affects substantial rights. *United States v. Baker*, 227 F.3d 955, 963 (7th Cir. 2000).

Even if the indictment alleged a scheme broader in scope than that proven at trial, we have repeatedly recognized that a prosecutor may elect to proceed on a subset of the allegations in an indictment, such as proving a conspiracy or scheme that is

smaller than the one alleged, so long as that subset is itself illegal. *Cruse*, 805 F.3d at 804; *United States v. Willis*, 2017 WL 3573395 at *5 (7th Cir. Aug. 18, 2017). Because the proven offense is a subset of the charged conspiracy or scheme in such a case, the variance is not fatal because the defendant was adequately notified of the allegations presented at trial and suffered no prejudice. *Neighbors*, 590 F.3d at 498.

The same reasoning applies if the additional allegations in the indictment did not represent a broader offense but merely added facts or details which were not established at trial, as Campbell alleges. We have repeatedly held that such a variance does not prejudice the defendant. "As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime. … A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as a 'useless averment' that 'may be ignored.'" *United States v. Quintanilla*, 2 F.3d 1469, 1475 (7th Cir. 1993) (quoting *Miller*, 471 U.S. at 136). In fact, Federal Rule of Criminal Procedure 7(d) provides a vehicle for the defendant to strike such surplusage from the indictment or information. If it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial, a district court presented with such a motion to strike may strike the allegations from the indictment in its discretion. *See* Fed. R. Crim. P. 7(d); *United States v. O'Connor*, 656 F.3d 630, 645 (7th Cir. 2011) (in response to the defendant's argument that the indictment included facts that pertained only to the actions of others in the scheme but erroneously and prejudicially implied her participation, court held that the wire fraud count incorporated by reference the entire fraudulent scheme, thus rendering such facts relevant.) Campbell does not argue that he brought any such motion to strike and it was denied.

We addressed an analogous situation to Campbell's in *United States v. Peters*, 435 F.3d 746, 752-53 (7th Cir. 2006). There, the defendant complained of sentencing allegations which were included in the indictment and were read to prospective jurors during voir dire. *Id.* at 753. Peters was convicted of willfully taking money from the presence of another by intimidation, and the additional sentencing details in the indictment included allegations of the brandishing of a weapon, physical restraint to facilitate escape, and loss in excess of $10,000. *Id.* We rejected Peters' claim, reasoning that allegations independent of the offense of conviction are surplusage which may be disregarded as long as the evidence at trial was sufficient to support the offense of conviction. *Id.* at 752. Moreover, in considering whether Peters was nevertheless prejudiced and the allegations should have been excluded under Rule 7(d), we held that while the allegations were not essential elements of the crime, they were relevant to the

elements of the offense such as intimidation, the presence of another, and the taking of money. *Id.* at 753. We further noted that the instruction by the court that the indictment was not evidence weighed against finding plain error. *Id.*

Similarly, the allegations in the indictment challenged by Campbell are independent of the allegations of the offense of conviction, and we have already held that the evidence presented at trial was sufficient to support that conviction. Campbell complains of additional allegations indicating the broader contours of the scheme. But such surplusage is not directly related to the offense of conviction and therefore is not a fatal variance. *See also United States v. Leichtnam*, 948 F.2d 370, 377 (7th Cir. 1991) (recognizing that if the evidence fails to prove every fact in the indictment, but proves the same scheme or a subset of it, the right to a grand jury has not been denied). As the Supreme Court recognized, courts have generally sustained convictions where the evidence upon which it is based corresponds to an offense clearly set out in an indictment, and any additional allegations in the indictment which are unnecessary to and independent of the allegations of the offense proved "may normally be treated as 'a useless averment' that 'may be ignored.'" *Miller*, 471 U.S. at 136 (quoting *Ford v. United States*, 273 U.S. 593, 602 (1927)). Because the challenged allegations in the indictment are mere surplusage and no prejudice has been demonstrated, the claimed variance is not fatal to the conviction.

## III.

The judgment of the district court is AFFIRMED.