**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joseph AGUILAR, Defendant–Appellant.**

**No. 90–2690.**

United States Court of Appeals,
Seventh Circuit.

Argued May 31, 1991.

Decided Nov. 22, 1991.

Barry R. Elden, George Jackson, III (argued), Asst. U.S. Attys., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Joseph R. Lopez (argued), Judith A. Halprin, Feldman & Halprin, Chicago, Ill., for defendant-appellant.

Before CUDAHY, POSNER, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Joseph Aguilar was tried before a jury and found guilty of conspiracy to possess cocaine with intent to distribute. He challenges his conviction, claiming insufficiency of the evidence, violation of his Sixth Amendment right to confrontation, and a variance between the indictment and proof at trial. For the following reasons, we affirm.

# I

## BACKGROUND

Joseph "Jose" Aguilar owned and operated the Fiesta Tropical ("Fiesta"), a bar in Rockford, Illinois. Luis Heredia owned and operated Luis Tacos Restaurant in the same town. Luis Armando Mendez–Martinez was friendly with Heredia, and had played baseball against Mr. Aguilar. In February 1990, Domingo Alvarez came to Rockford, claiming that he was a drug dealer from Texas with a large amount of cocaine for sale. Heredia, Mendez–Martinez, and Mr. Aguilar decided to buy cocaine from Alvarez, and distribute it in Rockford. In reality, Alvarez was an undercover DEA informant attempting to catch drug dealers in a "reverse buy" transaction.

In early February, Alvarez met several times with Heredia at Luis Tacos to discuss the possibility of Heredia's finding buyers for Alvarez's cocaine. Heredia was to receive a commission for every kilogram of cocaine sold. On February 17, Mendez–Martinez was in the Fiesta when he was approached by Mr. Aguilar. Mr. Aguilar asked Mendez–Martinez if he knew of anyone selling cocaine in the area. Mendez–Martinez told Mr. Aguilar that he "had a friend who had a friend who had merchandise." Mr. Aguilar asked him to bring the cocaine seller to the Fiesta.

Several days later, Mendez–Martinez met with Alvarez and Heredia at Luis Tacos. Mendez–Martinez told Alvarez that he (Mendez–Martinez) was the representative for a potential cocaine buyer. They settled on a price of $20,000 per kilogram of cocaine, and Alvarez agreed to meet the buyer.

Mendez–Martinez took Alvarez to the Fiesta, where they met Mr. Aguilar. Mendez–Martinez told Mr. Aguilar that Alvarez was the person selling the cocaine. Mr. Aguilar instructed them to exit the bar as though they were leaving and then go around to the back of the bar. Mr. Aguilar met them there and escorted them upstairs to a back room of the Fiesta. Mr. Aguilar stated that he had previously dealt cocaine and was interested in returning to the business. Mendez–Martinez confirmed the fact that Mr. Aguilar had been in the cocaine business saying that he had worked with him. Mr. Aguilar said that he wished to purchase cocaine for a price lower than $20,000 per kilo. Mr. Aguilar asked Alvarez to let him have one kilogram of cocaine on credit to restart his cocaine business and offered Alvarez the Fiesta as collateral. Alvarez told Mr. Aguilar that he would have to confer with his associates before the transaction could go forward. They agreed that Mendez–Martinez would call Alvarez the next day for an answer.

After leaving the bar, Mendez–Martinez told Alvarez that, although Mr. Aguilar did not want to commit himself to purchasing particular amounts, he (Mendez–Martinez) and Mr. Aguilar would be able to sell ten kilograms of cocaine per week. The next day, Alvarez spoke on the telephone with Heredia and Mendez–Martinez, who were at Luis Tacos. Alvarez asked Heredia for the name of the man he (Alvarez) had met with the night before.[1] Heredia identified him as "Jose." Alvarez told Mendez–Martinez that the Fiesta was acceptable collateral for the cocaine, but it needed to be "legal to a certain extent." Mendez–Martinez told Alvarez that he would have Mr. Aguilar turn over the papers for the Fiesta.

Mendez–Martinez went to the Fiesta and told Mr. Aguilar that the Fiesta was acceptable collateral. He also told Mr. Agui-

---

1. This was the first telephone conversation that DEA agents recorded in this matter. Alvarez taped all subsequent calls in the case.

lar that the suppliers were willing to supply cocaine up to the value of the bar. At that time, Mr. Aguilar requested ten cases (kilograms) of cocaine in exchange for a security interest in the Fiesta. Later that day, Mendez–Martinez confirmed with Alvarez that Mr. Aguilar wished to use his bar as collateral for ten kilograms of cocaine. Alvarez and Mendez–Martinez agreed that the transaction would be completed that Tuesday, as Mr. Aguilar had requested.

The day before the transaction was to occur, Heredia, Alvarez and Mendez–Martinez met to discuss the exchange. Alvarez asked Mendez–Martinez if they were going to go see Mr. Aguilar to finalize plans and preparations for the drug deal. Mendez–Martinez replied that Mr. Aguilar was in Chicago but that they could "finalize the transaction" without him because he was "in agreement." Heredia and Mendez–Martinez suggested that they carry out the transaction the following day at a truck stop on a highway. Alvarez reminded them to bring the deed to the Fiesta. Heredia offered to examine the deed, to make sure that there was no problem with it. Alvarez agreed to pay Heredia and Mendez–Martinez $3,000 for driving the cocaine from the truck stop back to Rockford.

On February 27, Mr. Aguilar gave Mendez–Martinez an envelope containing his liquor license and various tax receipts as collateral for the cocaine. Mendez–Martinez delivered the papers to Heredia, who advised Alvarez against accepting them. Alvarez told Heredia that Mr. Aguilar had to provide a quitclaim deed. Heredia told Mendez–Martinez to get more complete documentation from Mr. Aguilar. Mendez–Martinez returned to the Fiesta, and Mr. Aguilar gave him the original title to the Fiesta.

Mendez–Martinez and Heredia drove Heredia's van to a restaurant at the Des Plaines Oasis on Interstate 90, where they were to pick up the cocaine. They met with an undercover DEA agent, Rafael Tovar, who asked them to wait in their van. Agent Tovar wore a body recorder during the entire transaction. Other DEA agents conducted surveillance and monitored the body recorder. At the van, Heredia gave Agent Tovar the deed to the Fiesta, along with a note from Mr. Aguilar's attorney.[2] Heredia explained that Mr. Jose Aguilar's name was on the deed and that he owned the Fiesta. Heredia told Agent Tovar that the drugs were going to Mr. Aguilar. He also explained that he (Heredia) was the contact man for Alvarez, and Mendez–Martinez was Heredia's contact man.

Agent Tovar left the van and, after conferring with another agent, returned to the van. He told Heredia to sign the back of the attorney's letter and clarify that the deed was given to Agent Tovar with the consent of Mr. Aguilar. Heredia did so.[3] Agent Tovar then confirmed with Heredia and Mendez–Martinez that they were buying ten kilograms of cocaine. When Agent Tovar left the van, the other agents arrested Heredia and Mendez–Martinez.

Mr. Aguilar was arrested one month later on March 30, 1990. A jury convicted him on one count of conspiracy with intent to distribute cocaine. He was sentenced to 169 months of incarceration, followed by a five year probation period. Mendez–Martinez, who pled guilty, testified at the trial in exchange for a lighter sentence. Alvarez also testified, but Heredia did not.

## II

## ANALYSIS

### A. *Sufficiency of the Evidence*

 Mr. Aguilar argues that the evidence at trial was insufficient to support his conspiracy conviction. In Mr. Aguilar's view, the evidence failed to prove that a conspiracy existed and that he participated

---

2. The note read, "Dear Joe: Enclosed please find recorded deed for the South Main property. Call me if you have any questions. Very Truly Yours, [Signature]" [Tr. at 252].

3. Heredia wrote, in Spanish, "We are providing this property as a front or collateral for merchandise that we received on February 27, 1990. Joe Aguilar is the sole owner of the property. Jose Aguilar, Luis Martinez and Luis Heredia." [Tr. at 253].

in the conspiracy. We note initially that a defendant bears a "heavy burden" when he challenges his conviction based on insufficiency of the evidence. *United States v. Sullivan*, 903 F.2d 1093, 1098 (7th Cir. 1990). "The test is whether, after viewing the evidence in the light most favorable to the government, '*any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt.' " *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.1984) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)); *accord Sullivan*, 903 F.2d at 1098.

A conspiracy is a "confederation [of] two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *United States v. Hedman*, 630 F.2d 1184, 1192 (7th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981); *accord Sullivan*, 903 F.2d at 1098. The government must prove "that the defendant (1) knew of the conspiracy, and (2) intended to associate himself with the criminal scheme." *Sullivan*, 903 F.2d at 1098 (citations omitted). This circuit recognizes that circumstantial evidence may be used "as support, even sole support for a [conspiracy] conviction." *United States v. Durrive*, 902 F.2d 1221, 1229 (7th Cir.1990).

"The government need not establish that there existed a formal agreement to conspire; circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct may serve as proof." *United States v. Redwine*, 715 F.2d 315, 320 (7th Cir.1983), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984). Nor is it necessary that the government prove that the defendant knew the other members of the conspiracy or its details.

*Sullivan*, 903 F.2d at 1098 (citations omitted). An appellate court "should review challenges to the sufficiency of the evidence of a conspiracy's existence and a defendant's connection to the conspiracy under the same 'substantial evidence' standard we apply in non-conspiracy criminal appeals." *Durrive*, 902 F.2d at 1228.

Mr. Aguilar attacks the sufficiency of the evidence in respect to both the existence of the conspiracy and his participation in it. First, as to the existence of the conspiracy, Mr. Aguilar contends that the evidence suggests that there was no "common goal" among the conspirators, and thus no conspiracy, or in the alternative, that two conspiracies were shown to exist. He bases this contention on the separate agreements Alvarez had with both Mendez–Martinez and Heredia: Alvarez told Mendez–Martinez that they could discuss a lower price for the cocaine once the Fiesta was used for collateral, but asked him not to tell Heredia. Only Alvarez and Heredia knew that Alvarez would sell Heredia cocaine for $17,500 per kilogram, and that Heredia would resell it for $20,000. Heredia asked Alvarez not to deal with Mr. Aguilar directly because Heredia wished to retain his sales commission. Mr. Aguilar knew of none of these arrangements.

Secondly, Mr. Aguilar claims that, even if a conspiracy existed, he lacked the intent to participate. He met with Alvarez only once, on February 24. At that meeting, they discussed the possibility of the sale of one kilogram of cocaine, but not ten kilograms of cocaine. Moreover, Mr. Aguilar claims he never told Alvarez that he would put the Fiesta up as collateral for the ten kilograms. Mr. Aguilar also maintains that Alvarez never finalized the deal with him and argues that all the acts and statements that link him to Alvarez and the conspiracy were attributable to Mendez–Martinez.

In the government's view, the three conspirators acted in unison to achieve a common goal: the purchase and distribution of ten kilograms of cocaine. The government contends that the separate agreements do not amount to separate objectives and do not negate the evidence showing that a conspiracy existed. Moreover, according to the government, the evidence at trial showed that Mr. Aguilar had knowledge of the conspiracy, and intended to join it.

■ We believe that the evidence supports the government's position. The indictment alleged that from February 24

until February 27, 1990, Mr. Aguilar, Mendez–Martinez, and Heredia conspired to purchase cocaine with the intent to distribute. Heredia arranged for Mendez–Martinez to meet Alvarez, the supplier of the cocaine. Mendez–Martinez told Alvarez that he was the representative of a potential buyer (Mr. Aguilar). At Mr. Aguilar's request, Mendez–Martinez brought Alvarez to the Fiesta. Both Alvarez and Mendez–Martinez testified that they met with Mr. Aguilar in an upstairs room of the bar, and that Mr. Aguilar offered to use his bar as collateral for cocaine. Mendez–Martinez told Alvarez that he and Mr. Aguilar would be able to sell ten kilograms of cocaine per week. After Mr. Aguilar's meeting with Alvarez, Mendez–Martinez acted as Mr. Aguilar's go-between, running information between Mr. Aguilar and the other parties involved. Mendez–Martinez had Heredia call Alvarez from Heredia's restaurant, since Mendez–Martinez did not know how to use a pager. Mr. Aguilar told Mendez–Martinez how much cocaine to purchase. Mendez–Martinez and Heredia decided where and when to make the deal.

Both Heredia and Mendez–Martinez were instrumental in assisting Mr. Aguilar to make the purchase on credit. Mendez–Martinez told Mr. Aguilar that Alvarez would accept the Fiesta as collateral, and that he could take cocaine "on credit" up to the value of the bar. Heredia inspected the documents. Mr. Aguilar gave Mendez–Martinez two sets of documents, including his original title to the Fiesta, as collateral for the cocaine. The documents to the Fiesta passed back and forth between all three conspirators before they were turned over to Agent Tovar. At the Des Plaines oasis, Heredia signed the names of all three to the document that was to give a security interest in the bar to Agent Tovar. This credit arrangement is relevant and probative on the existence of a conspiracy and Mr. Aguilar's participation in it, especially in light of the fact that credit was extended to Aguilar to enable him to start up a cocaine business. The jury was entitled to conclude that this was to be a "longer-term, reciprocal relationship." *United States v. Baker*, 905 F.2d 1100, 1106 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 206, 112 L.Ed.2d 167 (1990); *see also United States v. Lamon*, 930 F.2d 1183, 1191 (7th Cir.1991).

There is other strong evidence of Mr. Aguilar's participation in the conspiracy. Mr. Aguilar is identified on the DEA telephone recordings as the man who met with Alvarez on February 24,[4] and as the man who offered his bar as collateral for ten kilograms of cocaine.[5] At the Des Plaines oasis, Heredia told Agent Tovar that the drugs were going to Mr. Aguilar, because he had put up the collateral. Heredia signed Mr. Aguilar's name as a recipient of the cocaine. Considering all the evidence in the light most favorable to the government, we find that the evidence was sufficient to support Mr. Aguilar's conviction for the single conspiracy charged in the indictment.[6]

---

**4.** The English transcript of the call made on February 25, admitted into evidence as Government Exhibit Tape 1, contains the following exchange:

> Alvarez: What was that guy's name ... the one we were talking with at the end.
> Heredia: Last night?
> Alvarez: Yes.
> Heredia: Oh. Jose. [Tr. at 56].

**5.** The English transcript of the call made on the afternoon of February 25, marked as Government Exhibit Tape 2, contained the following exchange:

> Alvarez: You don't mind doing that?
> Martinez: No, no, no. Yes, the other guy said yes, he wants to.
> [conversation omitted]

> Alvarez: So, then, how do you want to do it? ... for me to go talk with you guys again or what?
> Martinez: Uh, well, maybe said ... said if you could find some ten cases.
> [Tr. at 65–66].

**6.** Mr. Aguilar alleges that multiple conpiracies were proved at trial in variance with the single conspiracy charged in the indictment and that this variance prejudiced his ability to prepare a defense. Because we have determined that the evidence was sufficient to support his conviction for the single conspiracy charged in the indictment, we need not discuss this contention. *See United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir.1991) (quoting *United States v. Prince*, 883 F.2d 953, 959 (11th Cir.1989)) ("[E]ven if the evidence arguably establishe[d]

## B. *Limitation on Cross–Examination*

Mr. Aguilar also claims that his cross-examinations of Mendez–Martinez and Alvarez were so limited that they violated his Sixth Amendment right to confrontation. Mr. Aguilar argues that he was not allowed to explore fully Mendez–Martinez's meetings with the government agents, and that the district court sustained government objections to that line of inquiry. Mr. Aguilar does not list any particular limitations of his cross-examination of Alvarez.

It is well-established that the Sixth Amendment only guarantees the defendant the opportunity for effective, not limitless, cross-examination. *United States v. Muhammad,* 928 F.2d 1461, 1466 (7th Cir.1991). A limitation does not violate the defendant's rights if the cross-examination produces sufficient evidence to enable the jury to make a "discriminating appraisal of the witness's motives and bias." *Id.* at 1467. The pages of the transcript cited by Mr. Aguilar as a limited cross-examination of Mendez–Martinez contain only one sustained objection, and the next question appears to have elicited much of the same information. Any bias of Mendez–Martinez was brought out on cross-examination, and the jury had a chance to weigh his credibility. Mendez–Martinez was questioned on cross-examination about: his cooperation in exchange for a lighter sentence; his meetings with government; whether his initial meeting with Mr. Aguilar actually occurred; and whether Mr. Aguilar actually agreed to purchase the cocaine.

Mr. Aguilar's cross-examination of Alvarez encompassed more than 100 pages. In this cross-examination, Alvarez admitted that he has received almost $55,000 working for the DEA, that he received $1,250 for his work on the present case, and that his compensation increased in proportion to the assets seized. In short, Mr. Aguilar had an adequate opportunity to cross-examine both Alvarez and Mendez–Martinez.

### Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

---

multiple conspiracies, there [is] no material variance from an indictment charging a single conspiracy if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment."). Mr. Aguilar asserts that it was improper for the government to use the testimony of coconspirator-turned-government witness Mendez–Martinez to link him to the conspiracy. He relies on authority, antedating the Supreme Court's decision in *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), relating to the admissibility of out-of-court hearsay statements of coconspirators. Here, however, it is Mendez–Martinez's trial testimony that is at issue. Mr. Aguilar was able to attack Mendez–Martinez's credibility on cross-examination, and the jury, which is the only entity entitled to make such credibility determinations, apparently decided to believe his testimony. *See United States v. Molinaro,* 877 F.2d 1341, 1347 (7th Cir.1989).

Mr. Aguilar also claims that the government violated Federal Rule of Evidence 615 by coaching Mendez–Martinez before trial. Mr. Aguilar misapprehends the nature of Rule 615. The rule provides: "At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses." In this case, Mr. Aguilar does not assert that Mendez–Martinez heard other testimony, only that reports were read to him in preparation for trial.