MANION, Circuit Judge.
 

 Sports memorabilia store owner Eugene Liporace was convicted of concealing assets from a bankruptcy trustee, knowingly mak
 
 *543
 
 ing a false statement under oath in a bankruptcy deposition, and making a false statement on a bankruptcy petition. The district court sentenced Liporace to 18 months in prison, to be followed by three years of supervised release. Liporace appeals, asserting that the district court erred in making evidentiary rulings, in instructing the jury, and in calculating the loss for purposes of his sentence. We affirm.
 

 BACKGROUND
 

 Eugene Liporace, a self-described sports enthusiast, tried to turn his amateur passion into a profession by opening two Seventh Inning Stretch, Ltd. stores which specialized in sporting collectibles such as sports cards, autographed balls, bats, and figurines. Unfortunately, he couldn’t make the pros — on December 11, 1991 Liporace filed for Chapter 13 bankruptcy. Sometime during this process he closed one of the stores which was located in Schaumburg, Illinois, and moved his entire business to the other store located in Palatine, Illinois.
 

 In March 1992, the bankruptcy court converted Liporace’s Chapter 13 bankruptcy into a Chapter 7 bankruptcy and appointed Andrew Maxwell trustee. Maxwell learned that Liporace was still doing business out of the Palatine store in July 1992 when Lipo-race’s former landlord contacted Maxwell to discuss Liporace’s back rent. Following this call, Maxwell hired Mr. Lawton, a former fraud investigator, to investigate the store. Maxwell selected Lawton because of his reputed knowledge about sports memorabilia. Lawton went to the Palatine store on July 26, 1992, and while there noticed numerous expensive sports cards featuring sport celebrities like Babe Ruth, Lou Gehrig, and Michael Jordan.
 

 Two days later, on July 28, 1992, Maxwell and a paralegal went to take possession of the store. Liporace refused to turn the store over to him and called the police. The police told Maxwell to leave. He did. After Maxwell left, Liporace told Tim Prince, a part-time cashier, and A1 Szewczyk, another employee, to pull any cards worth more than $75. He also told them to mix up the cards in the display ease so that it looked like none of the cards were missing. Prince testified that he specifically recalled pulling the Babe Ruth and Lou Gehrig cards, and that he gave those to Liporace who put them in boxes. When Prince and Szewczyk finished removing the more expensive cards, Liporace told them to put the boxed cards in his van. In total, Liporace removed about fifteen boxes of cards.
 

 The next day, this time armed with a court order, Maxwell returned to the Palatine store. Maxwell had a locksmith remove the locks. He next secured the premises and posted the court order. Maxwell then spent the rest of the day in the store reviewing the inventory. He specifically looked for the baseball cards that Lawton had previously seen at the store, but he could not find them. Maxwell later called Lawton, and together they looked for the Babe Ruth, Lou Gehrig, and Michael Jordan cards. They did not find them, and they have not turned up since. This is probably because, according to Szew-czyk, Liporace claimed to have given the boxes of cards to an associate. Liporace also stated that the merchandise in the boxes was worth over $110,000.
 

 Based on these and other facts irrelevant for purposes of this appeal, a grand jury indicted Liporace in a three-count superseding indictment. Count one charged him with concealment of assets in a bankruptcy case, based on Liporace’s removal of the cards from the Palatine store. Count two charged him with knowingly making a false statement under oath in a deposition related to a bankruptcy proceeding, based on Liporace’s testimony that he only removed one card from the store (not ten to fifteen boxes). Count three charged that Liporace made a false statement on his bankruptcy petition. (This false statement is unrelated to the Seventh Inning Stretch operations and the sports cards Liporace removed; it involved Lipo-race’s false statement on his Chapter 13 petition that he had not transferred any real estate within one year preceding the filing.) Liporace pleaded not guilty, but a jury convicted him on all counts. He was sentenced to eighteen months in prison to be followed by a three-year period of supervised release. He was also ordered to make restitution to
 
 *544
 
 the bankruptcy estate in the amount of $60,-000. Liporace now appeals.
 

 DISCUSSION
 

 On appeal, Liporace contends that the district court violated his Sixth Amendment right of confrontation by refusing to allow him to elicit testimony from Maxwell comparing how much Maxwell made as a trustee and lawyer in his bankruptcy case, versus how little- creditors actually received. Liporace also challenges the court’s instructions, arguing that the court wrongly refused to give the jury a “Testimony of Perjurer” instruction. Finally, Liporace objects to his sentence, claiming that the district court erroneously concluded that the loss’ of the cards exceeded $70,000.
 

 The Sixth Amendment
 

 Liporace argues that the district court violated his Sixth Amendment right to confrontation because he could not question Maxwell about the large amount of money Maxwell made on his bankruptcy, compared to the small recovery by the creditors. Specifically, Liporace wanted Maxwell to testify that he received a total of $69,870.90 in fees for his roles as both trustee for Liporaee’s estate and as attorney for the trustee, while the four secured creditors only received a total of $21,486.17, and the 25 unsecured creditors recéived absolutely nothing. '
 

 While the district court restricted Li-porace’s cross-examination, the limitation was minor. Liporace was allowed to question Maxwell extensively and in fact elicited testimony that Maxwell was compensated in the bankruptcy case, that an estate without assets does not generate fees for the trustee, that Maxwell hired his own law firm to work for him as trustee, and that Maxwell’s law firm also was compensated because of its work on Liporace’s bankruptcy case. The Sixth Amendment to the United States Constitution provides that “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him_” While limitations that interfere with the jury’s ability to make a discriminating appraisal of the witness’ motive and bias violate the defendant’s right to confrontation under the Sixth Amendment,
 
 United States v. Wellman,
 
 830 F.2d 1453, 1465 (7th Cir.1987), “[i]t is also well established that the Sixth Amendment only guarantees the defendant the opportunity for effective, not limitless cross-examination.”
 
 United States v. Aguilar,
 
 948 F.2d 392, 397 (7th Cir.1991). Because Liporace had more than a sufficient chance to call into question Maxwell’s testimony, the Sixth Amendment was not implicated.
 

 To be admissible, evidence must be relevant. Not only was the Sixth Amendment not implicated, the evidence Liporace sought to elicit does not even meet a low relevancy threshold. Relevant evidence must have some “tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.”
 
 United States v. Abel,
 
 469 U.S. 45, 50-52, 105, S.Ct. 465, 468-69, 83 L.Ed.2d 450 (1984). How much Maxwell made and how little creditors received in comparison is completely irrelevant to any issue in the criminal case against Liporace; it does not have the tendency to make the existence of any consequential fact more or less likely.
 

 But, Liporace argues, it shows that Maxwell was motivated by greed rather than justice. How this demonstrates greed and why such greed has any bearing remains a mystery. The fact that Maxwell made his livelihood — and maybe a good one at that-as a trustee and lawyer doesn’t mean that he is greedy. But it must have been greed, Lipo-race rejoins, because before Maxwell learned of the additional assets he did not do anything. Of course, why would he do anything if there were no assets to collect, appraise, protect, or distribute? As would any responsible trustee, Maxwell investigated Lipo-race’s operations, and once he discovered valuable assets he took steps to recover those assets for the benefit of the creditors. Lipo-race still complains that Maxwell made most of the money leaving the creditors little or nothing, all because of Maxwell’s greed. This view of greed seems to be in the eyes of the beholder. The evidence indicates that Liporace took many valuable assets for him
 
 *545
 
 self or perhaps for his favored creditors, leaving the trustee with an expensive search and a greatly diminished estate to distribute among the other creditors whose losses Lipo-race belatedly laments. At best, exposure of what Liporaee defines as Maxwell’s “greed” would perhaps show that Maxwell had a weak character. If that’s the relevance Lipo-race sees, he still loses because character evidence is inadmissible even though a person with poor character may be more likely to he, cheat, or steal than someone with good character. Fed.R.Evid. 404. Either way, the district court did not abuse its discretion in refusing to allow this testimony.
 
 [1]
 

 Perjury Instruction
 

 Liporaee next challenges the district court’s refusal to give the jury a “Testimony of Perjurer” instruction. Liporaee sought this instruction because A1 Szewczyk, who testified that Liporaee had him box up and remove the valuable sports cards, had previously lied to governmental authorities and filed a false police report. Szewczyk admitted this during cross-examination, explaining that in 1988 or 1989 while working as a pizza delivery driver he was robbed at gun-point, although the robbers only took the pizzas. When Szewczyk told the pizza store owner about the robbery, the owner did not want to call the police. Upset by the incident and the store owner’s nonchalant attitude, Szewczyk told the owner that the robbers also took $200. The owner then agreed to call the police. Szewczyk told the police that the robbers took the pizzas and $200, but a few days later admitted that he lied. Szewczyk was charged with filing a false police report. He received several years of court supervision, and the charges were dismissed.
 

 Based on this testimony, Liporaee requested that the jury be given a modified “Testimony of Perjurer” instruction based on Seventh Circuit Pattern Jury Instruction 3.21:
 

 Szewczyk has admitted lying to law enforcement authorities. You may give his testimony such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care.
 

 The district court refused this instruction. We review jury instructions to determine whether the instructions as a whole provided the jury with sufficient guidance and correctly informed the jury of the applicable law and theory of defense.
 
 United States v. Rice,
 
 995 F.2d 719, 724 (7th Cir.1993). A court is not required to give a proposed jury instruction “if the essential points are covered by those given.”
 
 United States v. Penson,
 
 896 F.2d 1087, 1090 (7th Cir.1990). “As long as the instructions treat the issues fairly and adequately they will not be interfered with on appeal.”
 
 United States v. McNeese,
 
 901 F.2d 585, 607 (7th Cir.1990).
 

 In this case, the jury was adequately instructed. Szewczyk was not a perjurer and his lie to the police officers is not sufficiently similar to perjury as to warrant the same skepticism we give to the testimony of perjurers. See
 
 United States v. Xheka,
 
 704 F.2d 974, 987 (7th Cir.1983) (court properly rejected defendants’ proposed perjurer instruction because there was no proof that witness was a perjurer in legal sense of the term). Because Szewezyk’s he did not constitute perjury, the general instruction given to the jury that it was to make its own credibility determinations and to consider the “witnesses’ intelligence, ability and opportunity to observe, age, memory and manner while testifying and any interest, bias or prejudice the witness might have, and the reasonableness of the witness’ testimony considered in light of all the evidence in the case” adequately treated the issue of credibility. Thus, there was no error in the instructions.
 

 Sentence
 

 Liporaee also appeals his 18-month sentence. He claims that the district court erred in calculating the amount of loss in-
 
 *546
 
 volved in his offense under Sentencing Guideline Section 2Fl.l(b)(l). Section 2F1.1(b)(1) provides that if the crime involved a loss greater than $2,000 the sentence should be enhanced by the amount of the loss, and if the amount of the loss exceeds $70,000, the sentencing level is enhanced six levels. The district court concluded that the amount of the loss caused by Liporaee’s offenses (specifically the loss of the sports cards) totaled over $70,000.
 

 We review, the district court’s calculation of the amount of the loss involved under section 2Fl.l(b)(l) for clear error.
 
 United States v. Johnson,
 
 16 F.3d 166, 170 (7th Cir.1994);
 
 United States v. Strozier,
 
 981 F.2d 281, 283 (7th Cir.1992). A loss need only be supported by substantial evidence; the amount need not be proven beyond a reasonable doubt. Moreover, the “loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information.” U.S.S.G. § 2F1.1, Application Note 8.
 

 In this case, the trial testimony established that the amount of the loss exceeded $70,000. Specifically, Szewczyk testified that Liporace had told him that the value of the cards taken out of the store was “over $110,000.” That testimony provided a sufficient basis for the court’s estimation of loss. No more was required. Finally, we reject Liporace’s attempts to argue for a lower figure, especially where he himself, by taking the cards, made it impossible for the government to provide a more accurate figure. Accordingly, in addition to Liporace’s conviction, we affirm the district court’s sentence.
 

 [1]
 

 . We also reject Liporace’s comparison of Maxwell to a paid informant. The type of informant Liporaee points to is paid for his assistance in the investigation and prosecution of a criminal, and because of this the informant has a personal interest in the apprehension and conviction of the defendant. Maxwell, on the other hand, as a bankruptcy trustee was a court-appointed fiduciary serving in the public interest, whose fees are court-approved and who was an integral part of the bankruptcy proceeding. The fact that he is paid for his public role does not create a personal interest or bias. The two situations are inapposite.