In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 10-1188 & 10-2156

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSEPH R. PERSFULL and JAMES PERSFULL,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
Nos. 08 CR 50025-1 and 08 CR 50025-2—**Frederick J. Kapala**, *Judge.*

ARGUED APRIL 12, 2011—DECIDED OCTOBER 6, 2011

Before KANNE and EVANS *, *Circuit Judges*, and CLEVERT, *District Judge.***

---

* Circuit Judge Evans died on August 10, 2011, and did not participate in the decision of this case, which is being resolved by a quorum of the panel under 28 U.S.C. § 46(d).

** The Honorable Charles N. Clevert, Jr., Chief Judge of the United States District Court for the Eastern District of Wisconsin, sitting by designation.

CLEVERT, *District Judge*. The same day that James Persfull discharged his debts in a Chapter 7 bankruptcy, his mother, Eileen Persfull, died, leaving James and his brother, Joseph, equal shares in the estate.[1] James signed a disclaimer of his interest, but never told the trustee about his inheritance. Following a series of transactions between James, Joseph, and various accounts, the United States Attorney's office launched an investigation, and the brothers were charged with bankruptcy fraud. James was also charged with impeding a bankruptcy trustee in the course of his duties and fraudulently concealing assets. Throughout their trial, neither James nor Joseph disputed the post-bankruptcy financial transactions that led to James's possession of portions of the inheritance. Instead, they argued that it was brotherly love—not a sinister scheme—that led to the transfers. Following their convictions, James and Joseph appealed. We affirm.

## I. BACKGROUND

On March 14, 2003, James Persfull filed a Chapter 7 Bankruptcy Petition, Schedules of Assets and Liabilities, and Statement of Financial Affairs. At the initial meeting of creditors on April 21, 2003, the following exchange took place between James, his attorney Donald Sullivan, and the bankruptcy trustee, James Stevens:

---

[1] For the sake of clarity, we will refer to the members of the Persfull family by their first names.

Stevens: Are you currently entitled to receive any type of inheritance at all?

Persfull: No, sir.

Stevens: You understand that if you are notified within the next six months that you are entitled to receive an inheritance that your [sic] are required to notify your attorney and the Trustee?

Persfull: Yes, sir.

Sullivan: Now, we would point out that his mother is very ill and he's explained that to me, and I've also explained that if he does get an inheritance or an interest in property that he has to disclose that to my office.

Stevens: Good, good. Alright with that I'll conclude your meeting. Thank you.

Two days after that meeting Eileen died testate appointing James and Joseph to serve as executors with equal shares in the estate, and Stevens filed a No Asset Report discharging James's debts. James, who never notified Stevens that he was entitled to an inheritance, signed two documents (1) declining to serve as executor of his mother's estate; and (2) disclaiming his interest in any type of property that he would receive as a result of his mother's death. The irrevocable disclaimer stated that it had been delivered to Joseph.

Over a year and a half later, Stevens learned that James may have an interest in two parcels of real estate and was

entitled to an inheritance. Stevens reopened the bankruptcy on January 19, 2005, and was reappointed trustee before meeting with James and his attorney on February 1. When asked whether he had brought a mortgage current or paid it off, James admitted that he received two loans from Joseph—one for approximately $28,000 and the other which allowed him to retire the mortgage on his Briar Cliff residence. However, later in the conversation James told Stevens to check with Joseph about the source of the money because he wasn't sure if it was a loan or had something to do with his inheritance. For the first time, James mentioned that his mother had died, but he denied knowing anything about his mother's estate.

After obtaining copies of the will, declination, and the disclaimer, Stevens requested that James quit claim his interest in the Briar Cliff residence to Stevens as trustee. James never complied with this request or otherwise amended his bankruptcy schedules to disclose any inheritance, life insurance benefits, annuity interests, joint interests in stocks, T-bills, or savings bonds. Instead, knowing that Stevens wanted to sell the Briar Cliff home, James obtained a mortgage loan on the home and deposited the proceeds ($79,908.90) in his Amcore Bank account on March 18, 2005. He used approximately $15,000 of the proceeds to buy a car, and transferred $55,000 to an E*Trade account he owned.

Stevens unsuccessfully attempted to contact Joseph by phone. By letter dated April 20, 2005, Stevens informed Joseph that he had filed a lien again Eileen's 5215

South Massasoit Avenue home. Joseph did not respond. James, on the other hand, requested a meeting and asked how much money he needed to pay the creditors in full. James informed Stevens that the Briar Cliff home was worth something less than $175,000 and that there was a lien on the home. James informed Stevens that he had $50,000 to pay creditors.

By November 2005, James had transferred money from his E*Trade account back to his Amcore account and paid Stevens $50,000. Stevens received an additional $8,231.86 in December from the proceeds of the sale of Eileen's South Massasoit Avenue home. During the closing of that sale, James and Joseph provided a signed, handwritten document indicating that the proceeds were to be split between them equally. In addition, an attorney helped prepare a handwritten "Affidavit of Heirship" falsely stating that Eileen died "leaving no last will and testament." James provided the information for the affidavit and signed the same.

James and Joseph were charged in a six-count superseding indictment on December 16, 2008. Both were charged in count one with bankruptcy fraud in violation of 18 U.S.C. § 157(3). James was charged in counts two, four, and five with bankruptcy fraud in violation of 18 U.S.C. § 152(1), and in count three with obstruction of justice in violation of 18 U.S.C. § 1503. Joseph was charged in count six with making a false statement in violation of 18 U.S.C. § 1001. Trial began on September 14, 2009, and James was convicted on all counts charged. Joseph was convicted on count one. Counts three and six were eventually dismissed.

At trial, the government introduced evidence regarding the inconsistent use of the disclaimer and assets that were not disclosed in James's bankruptcy schedules. For example, James and Joseph submitted separate claims as the beneficiaries of Eileen's two whole-life insurance policies issued by Metropolitan Life Insurance Company. Using the same Naperville, Illinois, address on their respective claim forms, each son received an identical benefit payments check from Metropolitan. Joseph's check and James's check (which was endorsed by James and Joseph) were deposited into the same account—a TCF bank account owned jointly by Eileen and Joseph prior to Eileen's death. Although Metropolitan's records contained copies of the declaration and disclaimer, Metropolitan did not distribute the policy benefits in accordance with the disclaimer.

In addition, on May 5, 2003 Joseph notified Phoenix Mutual Life Insurance of Eileen's death. He submitted two claim forms later that month—one signed by him and the other signed by James. With those forms, Joseph provided copies of the disclaimer and declination. The letter stated in part: "[E]nclosed with these forms is a 'Disclaimer of Inheritance' form which was signed by my brother 'James' to exclude him from any dealings with the estate, due to him going thru a bankruptcy presently." Phoenix honored the disclaimer and Joseph's request for the proceeds and issued a check for the full benefits to Joseph. That check was deposited at the same time and to the same account as the Metropolitan proceeds checks.

Meanwhile, on October 2, 2003, Joseph telephoned Jackson National Life Insurance to notify them of his mother's death. Separate packages of claim forms for the individual fixed annuity death benefit policy were sent to James and Joseph at the same Naperville address. James and Joseph submitted separate claims for the Jackson Life benefits on October 14, 2003, each of which elected a lump sum distribution, and both claim forms bore the signature of the same witness. Jackson Life routinely honored disclaimers of benefits, but the records relating to Eileen's annuity policy did not contain any disclaimer documents or references to any disclaimer.

Jackson Life mailed separate letters dated October 30, 2003, to James and Joseph at the Naperville address confirming that the benefits had been deposited into their beneficiary access accounts at Jackson Bank. James's beneficiary access account was opened at Jackson Bank on October 29, 2003, with the deposit of the policy proceeds, $29,307.78. Joseph's Naperville address was the address on the account. James signed each of the three checks that were written on the account, totaling more than $29,000, and all were deposited into one of James's accounts at Amcore Bank.

On December 4, 2003, James used the funds in his Amcore Bank account to pay $22,095.75 on his mortgage loan and stop foreclosure proceedings on his Briar Cliff home. The source of the funds in the Amcore account was three checks written by James on his Jackson Federal beneficiary account. Further, on February 13, 2004,

Amcore received a TCF Bank official check in the amount of $140,000 that was applied to the Briar Cliff loan payment to reduce the balance from $148,406.54 to $8,406.54. The source of the funds was the TCF Bank account jointly owned by Joseph and Eileen prior to her death. The funds in the TCF deposit account came from various sources, but the most significant were the proceeds of the Metropolitan policies, the Phoenix policy, proceeds from an American Funds account owned jointly by Eileen and Joseph, and redemption proceeds from T-bills owned by Eileen with James and Joseph.

Specifically, James and Eileen owned five T-bills as joint tenants with the right of survivorship. Each had a thirteen-week term and was rolled over one or more times. Some occurred because specific rollovers were scheduled at the time of purchase whereas others occurred when someone directed the rollover. On seven occasions after Eileen's death, the Bureau of Public Debt was directed to roll over the T-bills owned jointly by Eileen and James. Between November 2003 and January 2004, the five T-bills were redeemed automatically and the $48,000 in proceeds was deposited into the same TCF Bank account where the Metropolitan and Phoenix policy proceeds had been deposited.

Joseph changed the address associated with the Eileen/Joseph T-bills telephonically on May 29, 2003, from Eileen's South Massasoit Avenue address to Joseph's Naperville address. The address associated with the Eileen/James T-bills was also changed to Joseph's

Naperville address. Bureau of Public Debt records reveal that on June 2, 2003, a person using the name "Jim" telephoned to confirm the address change request and that only an account owner could make such a request.

Eileen owned savings bonds with James as the joint owner or the beneficiary, and she owned bonds with Joseph as well. The registered ownership of those savings bonds remained unchanged at the time of trial. James and Joseph applied to cash out other savings bonds approximately 15 months after Eileen's death. James and Joseph were identified as the people having an interest in the estate and the application sought separate lump sum distributions. James provided his Briar Cliff address, and Joseph provided his Naperville address. James's distribution check was deposited to his Amcore account on September 29, 2004.

In addition, Eileen owned shares of stock in AT&T, Bell South, Verizon, and Comcast, with James and Joseph as joint tenants with the right of survivorship. Approximately 11 months after Eileen's death, James submitted change of ownership documents to change ownership of the shares he had jointly owned with Eileen to joint ownership with Joseph. Under oath in those documents, James stated he was a "survivor in joint tenancy" as a result of Eileen's death. The change of ownership requests used James's Briar Cliff address as the address for the share accounts. Except for the use of his Naperville address for the account, Joseph handled the ownership of his jointly owned shares identically by transferring ownership to James and Joseph as joint tenants with right of survivorship. Records of the company that

handled the share transfers contained no reference to a disclaimer of inheritance.

Several E*Trade accounts were not disclosed by James in his schedules. The first account, opened on April 12, 2000, used James's Briar Cliff address and had a balance of one cent at the time of the petition. The second E*Trade account was opened on April 10, 2002, using Joseph's name and Naperville address. The account was still open when the petition was filed. No activity occurred until less than one month prior to the filing of the bankruptcy petition, when, on February 24, 2003, a $5,000 deposit was made. James admitted that he handled all the trading in the account and signed Joseph's name to an application for checks and an ATM card for the account. James's Statement of Financial Affairs denied controlling any property owned by another person.

Four checks were used to withdraw available funds from the second E*Trade account. Between March and August of 2004, James wrote the checks for his personal benefit, and three of the checks bore his signature. He was not authorized to sign checks on the account. Joseph's name was on the fourth check's signature line, but James admitted he signed the name Joseph Persfull on the check.

Additionally, in the years prior to the bankruptcy James had filed federal income tax returns that reported income from electrical work he performed. His 2004 and 2005 returns reflected this type of income as well. James never reported income from any electrical work in 2003,

the year he filed for bankruptcy, even though he was paid once—possibly twice—for work performed for third parties. The first payment of $1,275 was made by check dated December 4, 2003, for work performed on November 19, 2003. The second was a check dated January 4, 2004, for $1,365 for work that may have been done prior to the end of 2003. He operated the business outside of his regular working hours, but no income was disclosed on his Statement of Financial Affairs. That document, signed under penalty of perjury, required disclosure of income received during the two years prior to the March 2003 Chapter 7 bankruptcy filing.

James did not list Lazer Electric on his tax returns, but used that name when he opened the account at Amcore Bank in March 2002. The account, with an approximate balance of $240, was not closed until December 2003. While his bankruptcy schedules required that trade names used during the prior six years be listed, none were. Further, the schedules required that all bank accounts be listed, but only one checking and one savings account at Amcore Bank were. Neither belonged to Lazer Electric. The petition and the schedules were signed under penalty of perjury.

## II. ANALYSIS

On appeal, James and Joseph argue that the government presented insufficient evidence to prove beyond a reasonable doubt that they schemed to defraud a bankruptcy trustee. Both maintain that their innocence was more probable than any theory of guilt. Alternatively,

they argue that counsel was ineffective in failing to move for judgment of acquittal on this ground. James further submits that the evidence was insufficient on the concealment counts, and that the government violated *Bruton v. United States*, 391 U.S. 123 (1968), by referencing Joseph's statement from an FBI interview during opening argument. Joseph adds that the district court erred by allowing an aiding and abetting instruction to be considered by the jury, and that counsel was ineffective in failing to seek a modified instruction.

The standard of review is dictated by the manner in which James and Joseph preserved their argument for appeal. Neither defendant filed a motion for judgment of acquittal or otherwise cited a rule in support of the acquittal. Nevertheless, they did move for a new trial, and, to the extent they made the argument in their motion, the district court's decision not to grant a new trial is reviewed for abuse of discretion. *United States v. Useni,* 516 F.3d 634, 650 (7th Cir. 2008).

Specifically, in his motion for a new trial, Joseph asserted that the government failed to produce direct evidence that he knowingly participated in bankruptcy fraud. The district court denied this motion as untimely. However, even if timely, the district court ruled that proof of knowledge is typically accomplished through circumstantial evidence and that the argument lacked merit. Implicit in this decision is that there was sufficient circumstantial evidence to sustain the conviction.

James argued that the government failed to present sufficient evidence in support of counts one through four.

The district court determined that James waived this argument by failing to provide any rationale or authority in support.[2]

In count one, James and Joseph were charged with devising a scheme to defraud the trustee by concealing James's inheritance interests through the creation and use of a sham disclaimer. A defendant is guilty of bankruptcy fraud where the person:

> who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—

> (3) makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title.

18 U.S.C. § 157(3). "[B]ecause direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself. . . ." *United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010) (citation omitted).

---

[2] The government argues that failure to preserve a challenge to the sufficiency of the evidence results in a plain error review of the issue. Because we conclude that there was no error under the more demanding abuse of discretion standard, we need not conduct a plain error review.

As to the remaining counts, concealment of assets, false oaths and claims, and bribery, the statute reads as follows:

> A person who—(1) knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under Title 11 . . . shall be fined under this title, imprisoned not more than 5 years, or both.

18 U.S.C. § 152(1). This statute is a congressional attempt to cover all the possible methods by which a debtor or any other person may attempt to defeat the intent and effect of the bankruptcy law through any type of effort to keep assets from being equitably distributed among creditors. *United States v. Ellis*, 50 F.3d 419, 422 (7th Cir. 1995) (citing *United States v. Goodstein*, 883 F.2d 1362, 1369 (7th Cir. 1989)).

On this record, there was no abuse of discretion in denying the motions for a new trial. The circumstantial evidence admitted at trial allows a reasonable jury to find that the brothers engaged in a fraudulent scheme. That evidence established that Joseph knew that James was keeping his inheritance from being administered by the bankruptcy trustee. The disclaimer states that a copy was served on Joseph, and Joseph wrote a letter to Phoenix Mutual Insurance stating "enclosed with these forms is a 'Disclaimer of Inheritance' form which was signed by my brother 'James' to exclude him from any dealings with the estate, due to him going thru a bankruptcy . . . ." James also testified that he asked an attorney, in Joseph's presence, whether he could keep his

inheritance out of the bankruptcy estate, and that the attorney indicated the disclaimer would fulfill that goal.

In addition, there was evidence of intent to use the disclaimer as a ruse. Joseph utilized the disclaimer to obtain 100% of the benefits from Phoenix and, therefore, knew he could use it to receive other benefits and property interests from his mother. However, Joseph made additional claims for Eileen's property that were inconsistent with the disclaimer. James admitted he received and used various proceeds for his own benefit after discharge of his debt, including the $29,000 claim on the annuity policy. Joseph also made a claim on the annuity policy but no disclaimer was provided. Meanwhile, James made claims on the savings bonds and stock interests he jointly owned with his mother, yet he failed to provide the disclaimer in those transactions. Moreover, James represented to the Bureau of Public Debt that he had an interest in his mother's estate. He made similar misrepresentations when he submitted affidavits to change ownership in the stocks, stated that he was the surviving joint tenant, and signed an Affidavit of Heirship indicating that his mother had no will.

In addition, the jury was entitled to assess credibility and the circumstances surrounding James's and Joseph's failure to make timely notifications of their mother's death. James learned of his mother's death two days after being told he must disclose an inheritance interest, but he never amended his bankruptcy schedules or notified the bankruptcy trustee of his inheritance interests. James represented that he had an

interest, made direct claims, and used the money for his own benefit, while Joseph used the disclaimer on a limited basis, waited over a year to notify the Bureau of Public Debt of his mother's death, and failed to respond to inquiries by the bankruptcy trustee after being threatened with legal action. While James and Joseph focus on the absence of direct evidence, circumstantial evidence is sufficient to prove fraudulent intent and to support a conviction. *See United States v. Webster*, 125 F.3d 1024, 1034 (7th Cir. 1997). Here, the circumstantial evidence allowed a reasonable juror to find the essential elements beyond a reasonable doubt.

Joseph and James rely upon a line of cases holding that, "[w]here the evidence as to an element of a crime is equally consistent with a theory of innocence as with a theory of guilt, that evidence necessarily fails to establish guilt beyond a reasonable doubt." *United States v. Delay*, 440 F.2d 566, 568 (7th Cir. 1971); *see also United States v. Harris*, 942 F.2d 1125, 1129-30 (7th Cir. 1991). The government responds by citing *United States v. Keck,* 773 F.2d 759, 769 (7th Cir. 1985), where we held that a reviewing court will not disturb a defendant's conviction when any rational juror could have found the defendant guilty beyond a reasonable doubt after viewing the evidence and all the inferences in the light most favorable to the government. Notably, the line of cases cited by James and Joseph applies when "the evidence is woefully inadequate" to establish an element of the offense. *Delay*, 440 F.2d at 568. In *Delay*, there was no direct or circumstantial evidence that the defendant possessed the requisite knowledge to support a finding of guilt. In contrast, the circumstantial evidence in this

record is more than adequate to support a guilty verdict. Because the brothers knew of the disclaimer, used it inconsistently, and concealed assets from the estate, their convictions on count one will be affirmed.

Similarly, the evidence was more than sufficient on the concealment charges. The evidence established that James knew he was required to disclose an inheritance and used the money as his own irrespective of the disclaimer. In addition, James failed to disclose the Lazer Electric account, the existence of the E*Trade account from which he wrote checks, his business's trade name, and previous income. As a general rule, in bankruptcy proceedings "[d]ebtors have an absolute duty to report whatever interests they hold in property, even if they believe the assets are worthless or are unavailable to the bankruptcy estate." *United States v. Van Allen*, 524 F.3d 814, 822 (7th Cir. 2008). Hence, the jury is entitled to assess James's credibility on these failures to comply with the bankruptcy law and factor that into a determination of guilt. The jury could reasonably infer guilt consistent with the government's theory of the case. On appeal, it is a monumental task to mount a successful sufficiency claim, and James and Joseph are light years away from meeting that burden. We will not disturb the jury's determination.[3]

---

[3] Joseph alternatively argues that the evidence was so tenuous that it renders his conviction "shocking" and therefore constitutes plain error. Because there was no abuse of discretion, there was no plain error.

James and Joseph maintain that regardless of the ruling on their motions for a new trial, counsel was ineffective in failing to move for judgment of acquittal. When assessing claims of ineffective assistance of counsel the court evaluates whether counsel's performance fell below an objective standard of reasonableness and whether defendant was prejudiced by counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is presumed to fall within a wide range of reasonable professional assistance and that the challenged act or omission might have been considered sound trial strategy. *United States v. Allen*, 390 F.3d 944, 951 (7th Cir. 2004). The court will find prejudice where there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* In cases such as this, where there was no abuse of discretion regarding sufficiency of the evidence, and certainly no plain error, defendants cannot satisfy the prejudice prong of *Strickland*, 466 U.S. at 687.

Next, James argues that the government committed a *Bruton* violation by "twice recounting an out-of-court statement allegedly made by Joseph Persfull during the Government's opening argument as means of establishing James Persfull's guilt." A trial court's ruling that impacts a defendant's Sixth Amendment right to confrontation is reviewed de novo. *United States v. Scott*, 145 F.3d 878, 887-88 (7th Cir. 1998).

Joseph was charged in count six of the superseding indictment with making false statements to FBI agents

during an October 2006 interview in violation of 18 U.S.C. § 1001. Although that count was dismissed at the end of the government's case in chief, several statements were made during the government's opening. Specifically, James refers to the following:

> [Y]ou might ask yourselves in listening to the evidence whether or not, well, maybe the disclaimer was real, and it's just brother Joseph decided to be generous to his brother James and give him some of that property. Even if it did happen to be about the same amount of what his inheritance would be, it was just a gift or a loan. But you'll hear the testimony that Joseph told the FBI in the investigation of this case that between the time of his mother's death and the time that he was interviewed in 2006, he gave no gifts or loans to his brother James.

> The one thing that we do think he told the truth about is that there were no gifts or loans to his brother because his brother took the inheritance property directly. Some was transferred by Joseph, but James himself claimed and took the money without it ever passing through Joseph's hands.

Counsel did not object during the opening.

At the beginning of the second day of trial, James argued that Joseph's statement was inadmissible. The government responded that the statement was admissible against Joseph as evidence of his participation in a scheme, and it would not object to an instruction that the statement could only be considered against Joseph. Later that day, James moved for a mistrial

based on the alleged *Bruton* violation. The district court denied the motion on the ground that the statement was neither facially incriminating nor inconsistent with James's innocence and that a limiting instruction would suffice. In addition to the opening instructions cautioning that statements were not evidence, the court gave the following instruction at the end of the government's case in chief:

> I'm going to give you an instruction. The United States has moved and I have agreed to dismiss Count 6, which charged only defendant Joseph Persfull with making a false statement to the FBI. I have dismissed that allegation because the government has failed to produce any evidence supporting it. While the government has not offered any evidence of making a false statement, it was referred to in opening statement. As I told you then, opening statements by the attorneys are only predictions of what the parties expect the evidence to be and are not evidence. I further instructed you to rely on the evidence you hear from the witness stand, the exhibits admitted into evidence, and any stipulations between the parties and not on what the parties' predictions in their opening statements might have been. I now instruct you to disregard entirely any statements made by the parties concerning the false statement count which is now dismissed, including references to any statements allegedly made by Joseph Persfull concerning gifts or loans to his brother James. As I have said, those state-

ments are not evidence and should not be considered by you in any way.

The defendants had no objection to the final instruction as given.

Under *Bruton*, "[a] defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 200, 201-02 (1987). However, in *Frazier v. Cupp,* 394 U.S. 731, 735 (1969), the Supreme Court held that a *Bruton* error did not occur where the prosecutor in his opening statement summarized inculpatory testimony he expected the defendant's accomplice to give, and the accomplice later refused to testify.

Joseph's statement was never admitted into evidence and was not facially incriminating. James argues that the statement contradicted his position that the money was a gift, but the statement alone did not implicate him in a crime. As such, James's Sixth Amendment rights were not compromised. As the Court said in *Bruton*, "Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently." *Bruton,* 391 U.S. at 135.

Moreover, the jury was given a limiting instruction to disregard the statement. Although *Bruton* made clear

that in certain circumstances a limiting instruction
cannot cure the harm caused by the admission of
improper evidence, we believe that under the circum-
stances of this case, the limiting instruction was
sufficient to safeguard any possible infringement of
James's constitutional rights. *See Frazier*, 394 U.S. at 735.
As the Supreme Court observed in *Frazier*, although it
may be "unreasonable to assume that a jury can
disregard a coconspirator's statement when introduced
against one of two joint defendants, it does not seem at
all remarkable to assume that the jury will ordinarily
be able to limit its consideration to the evidence
introduced during the trial." *Id.* at 736. Under these
circumstances and in the face of substantial evidence
apart from any statement made in the opening, there
is no basis for reversing the district court's decision.

Joseph additionally contends that the record did not
support an aiding and abetting instruction, and/or that
counsel was ineffective in failing to seek a modified
instruction. The district court gave the following
Seventh Circuit Criminal Pattern Jury Instruction:

> A person who knowingly aids the commission of an
> offense may be found guilty of that offense. The
> person must knowingly associate with the criminal
> activity, participate in the activity, and try to make
> it succeed.

Joseph's only objection at trial was based on the fact
that he was charged as a principal rather than an aider
and abetter. In his motion for a new trial, he argued that
the jury instruction was incomplete and should have

included additional language. For the first time on this appeal, Joseph submits that there was insufficient evidence to support giving the instruction to the jury.

To preserve an objection to a proposed jury instruction for appellate review, "a party must object to the instructions, 'stating distinctly the matter to which the party objects and the grounds of the objection.'" *United States v. O'Neill*, 116 F.3d 245, 247 (7th Cir. 1997) (quoting FED. R. CRIM. P. 30). Because Joseph did not preserve this claim below, it is waived on appeal, and his argument is reviewed for plain error.

Joseph now faces an uphill battle because it is rare that we reverse a conviction on the basis of an improper jury instruction to which there was no objection. *United States v. Wheeler*, 540 F.3d 683, 689 (7th Cir. 2008). An error is "plain" if it was "(1) clear and uncontroverted at the time of appeal and (2) affected substantial rights, which means the error affected the outcome of the district court proceedings." *United States v. Fernandez*, 282 F.3d 500, 509 (7th Cir. 2002).

As stated in the instruction, aiding and abetting requires knowledge of the crime being aided and abetted. Joseph argues that the "evidence did not establish that Joseph even knew James was violating the bankruptcy laws much less that Joseph assisted James in his wrongdoing." However, the government introduced evidence that Joseph knew James was using a disclaimer to keep his inheritance out of the bankruptcy estate while making claim to and using the funds as his own. Under such circumstances there was no error, let alone plain

error, in the district court giving the aiding and abetting instruction.

Joseph again submits that counsel was ineffective in failing to request the following additional language in the aiding and abetting instruction:

> However, that person must knowingly associate with the criminal activity, participate in the activity, and act in a way that the person knows will help the activity succeed. In other words, it is not enough that a person happens to act in a way that advances the criminal activity if that person has no knowledge that a crime is being committed or is about to be committed.

*See United States v. Ortega*, 44 F.3d 505 (7th Cir. 1995). Because there was sufficient evidence in the record to support the conviction based on the instruction given, it cannot be said that the failure to make this request resulted in prejudice. Nothing in the record provides a basis for second guessing counsel's decision.

Ultimately, "when an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed in a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose." *Massaro v. United States*, 538 U.S. 500, 504-05 (2003). "After *Massaro*, only the rarest and most patently egregious of ineffective assistance claims are appropriately brought on direct appeal because there is no risk to delaying until a fully developed record is made." *United States v. Harris*, 394 F.3d 543, 558 (7th

Cir. 2005). Joseph's claim of attorney error does not qualify "for this aggressive treatment." *See id.*

### III. Conclusion

We AFFIRM the judgment of the district court.